Hugh R. Elwyn, J.
The Commissioner of Social Services of Ulster County brings this proceeding pursuant to section 358-a of the Social Services Law for the approval of an instrument executed by a mother requesting that her child be temporarily cared for in foster care.
The instrument which was executed by the mother on October 30, 1975 prior to the effective date of the amendment of subdivision 3 of section 384 of the Social Services Law[1] and the enactment of section 384-a of the Social Services Law[2] is on New York State Department of Social Services Form DSS-2227 (8/73) entitled "Surrender of Child for Temporary Care by Sole Parent or Guardian”.
By the instrument the mother, Marsha Allen, certifies that she has "the authority pursuant to Section 384 of the Social Services Law, to commit said child to the care and custody of the Social Services Commissioner for the purpose of having such child cared for in foster care as a public charge in accordance with an instrument therefor.”
*267 The instrument continues in the first person as follows: "I hereby surrender and commit the care and custody of Penny Lynn Allen to Bernhardt S. Kramer, as the Social Services Commissioner of the County of Ulster, because I am unable to make adequate provision for her care, maintenance and supervision in my home and because, after due consideration, I believe that under the circumstances, the best interests of said child will be served by such foster care. I understand that the Commissioner may place said child directly with a foster family home or may otherwise provide foster care by placing her in another duly authorized agency and that I will be informed as to where said child is placed in foster care. I also understand it is my responsibility to keep the Commissioner and any other authorized agency caring for said child informed of my whereabouts and my plans to resume caring for her and of any delays which may make continuation of foster care necessary.
"Said surrender and commitment shall be:
"for an indefinite period, and until I notify the Commissioner, in writing, that I revoke this instrument and request that the child be returned to me”.
In spite of the repeated use of the words "surrender and commitment” and the ambiguity resulting from their use in the context of the above-quoted phraseology, the legal effect of this instrument, even prior to the 1975 amendment to subdivision 3 of section 384 and the enactment of section 384-a of the Social Services Law, was not to surrender the child to the commissioner for adoption or to commit the guardianship of the person or the custody of the child to the commissioner. Taken out of context the words could conceivably have that meaning, but taken in context the language of the instrument plainly negates any such meaning or intent. Indeed, the commissioner does not contend that this instrument has conferred upon him the guardianship of the child; he merely seeks this court’s approval of the mother’s request for temporary foster care pursuant to section 358-a of the Social Services Law.
Whatever ambiguity may have existed in the law prior to 90 days after August 9, 1975 has been removed by the 1975 amendment to subdivision 3 of section 384 and the enactment of section 384-a of the Social Services Law.
Section 384 of the Social Services Law prescribes the method by which the guardianship of the person and the *268 custody of a destitute child may be committed to an authorized agency, the terms of the written instrument which is known as a surrender and the manner of its execution.
The second paragraph of subdivision 3 of section 384 provides however that "Whenever the term surrender or surrender instrument is used in any law relating to the adoption of children, it shall mean and refer exclusively to the instrument hereinabove described for the commitment of the guardianship of the person and the custody of a child to an authorized agency by his parents, parent or guardian; and in no case shall it be deemed to apply to any instrument purporting to commit the guardianship of the person and the custody of a child to any person other than an authorized agency, nor shall such term or the provisions of this section be deemed to apply to any instrument transferring the care and custody of a child to an authorized agency pursuant to section three hundred eighty-four-a of this chapter. ” (Emphasis supplied.)
Section 384-a of the Social Services Law (L 1975, ch 710) prescribes the method by which the temporary care and custody of a child may be transferred by a parent or guardian to an authorized agency, the terms of the instrument and the manner of its execution. Subdivision 4 of section 384-a provides, however, that "An instrument executed pursuant to the provisions of this section shall not constitute a remand or commitment pursuant to this chapter. ” (Emphasis supplied.)
From these recent amendments to the Social Services Law it is plain that although the mother in this case signed an instrument which employs the words "surrender and commitment” her purpose was merely to transfer the child to the Social Services Commissioner for temporary care and that this instrument does not constitute either a remand or a commitment.
Indeed, the instrument itself as well as section 384-a of the Social Services Law reserves to the mother the right to revoke the instrument at any time and request that the child be returned to her. Upon such request being made the agency is required by law to return the child (Social Services Law, § 384-a, subd 2).
Since only the mother executed the instrument requesting foster care, the father of the child was duly notified of the filing of the petition and the pendency of the commissioner’s application for approval of the mother’s request for foster care. (Social Services Law, § 358-a, subd [4].) The requirements *269 of due process which were lacking in Stanley v Illinois (405 US 645) have thus been satisfied. A hearing having been directed, the court, in the exercise of discretion, appointed a Law Guardian to represent the child (Social Services Law, § 358-a, subd [6]). A hearing was held in this matter on February 10 and May 11, 1976 at which the mother was represented by counsel assigned by the court, the father by counsel assigned by the court, the Commissioner of Social Services by his counsel and the child by the court appointed Law Guardian. At the conclusion of the hearing of February 10, which consisted entirely of a colloquy between the court and counsel for the respective parties regarding the court’s jurisdiction and powers and at which no sworn testimony was taken, the court on its own motion pursuant to subdivision (5) of section 358-a of the Social Services Law made a temporary order transferring the care and custody of the child to the Social Services Commissioner pending a further hearing.
At the adjourned hearing held on May 11, the father, who is estranged from the child’s mother and who, although still married to her, is living in the State of Vermont with a woman not his wife, strenuously opposed the continuance of the child in foster care and in reliance upon his inherent rights as the child’s natural father demanded her immediate return to him and his paramour.
In support of the father’s demand for recognition of his parental rights, counsel for the father reminds the court that the United States Supreme Court has frequently emphasized that the right to raise one’s own children is a fundamental tenet of American law and custom. The rights to conceive and raise one’s children have been deemed "essential” (Meyer v Nebraska, 262 US 390, 399) have been described as one of the "basic civil rights of man” (Skinner v Oklahoma, 316 US 535, 541) and "[r]ights far more precious * * * than property rights” (May v Anderson, 345 US 528, 533). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.” (Prince v Massachusetts, 321 US 158, 166.) The integrity of the family unit has found protection in the due process clause of the Fourteenth Amendment (Skinner v Oklahoma, supra, p 541) and the Ninth Amendment (Griswold v Connecticut, 381 US 479, 496).
Moreover, there has been no proof in this proceeding that *270 the father has ever been judicially declared to be neglectful or abusive of this child or any of his other children. There has been no judicial determination of any kind concerning the father’s fitness as a parent. Consequently, counsel for the father argues that where the issue of a child’s custody arises in any contest between a parent and nonparent the father’s fitness as a parent must be presumed for there is no obligation on his part to prove his fitness or that the child’s welfare would be advanced by turning the child over to him; rather, that the burden of proving his unfitness is upon those who assert it and that the child’s well-being requires its separation from its parent (People ex rel. Kropp v Shepsky, 305 NY 465, 469; People ex rel. Portnoy v Strasser, 303 NY 539, 542; Matter of Jewish Child Care Assn. [Sanders], 5 NY2d 222, 229-230; People ex rel. Anonymous v Anonymous, 10 NY2d 332, 335; People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d 185, 192; Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196, 202-204; People ex rel. Anonymous v New York Foundling Hosp., 17 AD2d 122, 124-125; Connors v Arnold, 36 AD2d 1010; People ex rel. Claudia ”PP” v Sackey, 40 AD2d 130, 132).
The argument which the father’s counsel makes and the cases he cites in support thereof would be relevant and have much persuasive force if this were a proceeding involving the child’s custody in a contest between parent and nonparent (the Department of Social Services). This proceeding is not, however, a custody proceeding. It is rather a proceeding brought under section 358-a of the Social Services Law whose sole purpose is to secure for the Commissioner of Social Services judicial approval of the mother’s request for temporary foster care for her child so that the State may qualify for reimbursement from Federal funds for money expended for a child who is eligible for aid to dependent children while in foster care under the provisions of the Federal Social Security Act. (Matter of Lydia H, 77 Misc 2d 807.)
In this proceeding the court is not called upon to decide the issue of the child’s custody as between the mother, the father and/or the Department of Social Services. The issue before the court in this proceeding is clearly and rather narrowly defined by subdivision (3) of section 358-a of the Social Services Law which under subheading, "Disposition of Petition” states: "If the judge is satisfied that the parent, parents, or guardian executed such instrument because he or they would be unable *271 to make adequate provision for the care, maintenance and supervision of such child in his or their home, he may find and determine that the best interest and welfare of the child would be promoted by removal of the child from such home, and that it would be contrary to the welfare of such child for him to continue in such home, and he shall thereupon grant the petition and approve such instrument and the transfer of the custody and guardianship or care and custody of such child to such official in accordance therewith.”
The proof in this case shows that Marsha Allen, the child’s mother, has been abandoned by her husband and is presently a patient at the Wassaic State School for the mentally retarded. Information received from the Department of Social Services of the State of Vermont shows that she was born March 10, 1950 in New York. She attended a school for the retarded until she married Irva Allen. Marsha is almost mute and certainly the most pathetic figure involved in this case. Marsha is severely retarded with an I.Q. of 49 according to the Wechsler Adult Intelligence Scale.
Consequently, I am satisfied that the mother, Marsha Allen, executed the instrument because she would be unable to make adequate provision for the care, maintenance and supervision of her child in her own home and have no difficulty in finding and determining that the best interest and welfare of the child, Penny Lynn, would be promoted by removal of the child from any home the mother could provide and that it would be contrary to the welfare of such child for her to continue in such home.
As for the child, Penny Lynn Allen, information concerning her present status and condition is supplied by Louis R. Nelson, M.D., associate professor and vice-chairman, division of neurological surgery at the Albany Medical College of Union University. In a letter addressed to Mrs. K. Weiss, senior worker of the Children’s Division of the Ulster County Department of Social Services under date of January 16, 1976, Dr. Nelson writes: "Penny is almost three years old at the present time. Her status at the present time is as follows: (1) she has a residual left hemiporesis which is gradually improving, (2) she has E.E.G. evidence of a seizure disorder which is currently adequately controlled on Phenobarbital, and (3) she is delayed as far as developmental milestones goes. She has acquired a few words and is apparently now starting to stand up some.
*272 "It is my feeling that Penny can be best cared for in a residential setting such as in a foster home. It is my opinion that the care Mrs. Ashcroft (the foster mother) has given Penny is excellent. She is certainly conscientious and keeps me informed about Penny’s progress.
"It is my feeling that because of Penny’s delayed development and neurological residuals that she will probably require special schooling and certainly this perhaps should be looked into in the near future.
"Mrs. Ashcroft wishes to take her to a Shriner’s Hospital for evaluation. This is perfectly satisfactory with me and she apparently is making arrangements for this.”
As for the father, Irva Allen, and his home, the Department of Social Services of this county has received from the Department of Social and Rehabilitation Services from the State of Vermont a report under date of March 5, 1976 which reports that Mr. Allen has a history of severe alcoholism; he resides with a woman to whom he is not married and who has two children of her own by her marriage; the mother figure in the Allen home, Mrs. Flanders, is reported "to be of extremely limited intellectual ability with some severe psychological disturbances” and on a visit to the home by a social worker as part of an investigation in connection with the alleged neglect of the Allen children in a proceeding in a Vermont court in 1973 "the living conditions in the apartment were [found to be] atrocious.” For further details of the Allen family life style and home conditions reference is made to the aforesaid report which is part of the record in this case.
The report from the Vermont Department of Social and Rehabilitation Services concludes with this recommendation, "other than satisfying Mr. Allen’s own distorted concept of his role as father, return of Harold and Penny to Mr. Allen can serve absolutely no purpose. The children have nothing to gain and physical and psychological risk is extreme. I would add that because intervention in the family has been unsuccessful in the past, we can in no way guarantee the safety of the children in the Allen home.”
Penny Lynn Allen is far from being a normal child for her age. It is apparent to the court, if not to Mr. Allen, that because of the many neurological symptoms from which the child is suffering which has resulted in her delayed development, all of which is detailed and documented in the report of the Albany Medical College of Union University that Penny *273 requires specialized care and treatment. The derogatory and almost wholly negative report concerning the father, Irva Allen, particularly his history of severe alcoholism, his paramour Elizabeth Flanders with whom Mr. Allen resides, and the disorganized and potentially neglectful home environment to which the child Penny would be subjected were she to be returned to the father’s home lead the court to doubt seriously that the father and his paramour could provide the specialized care and treatment that Penny’s condition requires. In short, I am not at all satisfied that the father could make adequate provision for the care, maintenance and supervision of Penny in his home in the State of Vermont.
Consequently, the court finds and determines that the best interest and welfare of the child, Penny Allen would be promoted by removal of the child from such home, and that it would be contrary to the welfare of the child for her to continue in such home. The commissioner’s petition is therefore granted and the instrument executed by the mother requesting the transfer of the custody of such child to the commissioner for temporary foster care is approved. An order approving said instrument will be entered accordingly.
This decision approving the aforesaid instrument does not constitute a remand or commitment of the child to the Commissioner of Social Services pursuant to the Social Services Law and shall not preclude challenge by any interested party in any other proceeding to the validity of the instrument (Social Services Law, § 358-a, subd [3]).

. Effective on the 90th day after August 9, 1975 (L 1975, ch 710, § 5).

. Effective on the 90th day after August 9, 1975 (L 1975, ch 710, § 8).