OPINION OF THE COURT
Nanette Dembitz, J.
These seven proceedings (consolidated for the purpose of decision) each present the issue of delay in the adoption of newborn infants by couples seeking adoptive babies. The mothers of these infants, all born out of wedlock, abandoned them in the hospital of delivery, in most cases stating their desire for the child’s adoption; and the alleged fathers, if named by the mothers, never acknowledged in any way any connection with the children. Because of the delays in adoption, the infants have been kept for protracted periods in temporary foster homes maintained by the New York City Department of Social Services or by the private social agencies paid by the department to supply foster care. Considering the unanimous belief that early settlement in a permanent home is beneficial for child *126 development as well as for adoptive parents, the delays are detrimental from a child — and family welfare — standpoint; incidentally, they are also important fiscally, because of the high cost of foster care and efforts to cap its use, conserving it for children for whom an alternative method of care is unavailable.[1]
The primary legal question is whether this court has the power to issue appropriate adoption-expediting orders to the New York City Department of Social Services (herein DSS) and its allied private foster care agencies, in proceedings which like these are brought by DSS under section 358-a of the Social Services Law. Section 358-a proceedings are the court’s first opportunity to review a child’s foster care; the section provides for DSS to petition the Family Court for approval of a child’s placement in the DSS foster care system within 30 days of his entry. The DSS position is that in section 358-a cases the court’s authority is limited to considering whether the child’s interest required foster care at the time of his admission.[2]
If the DSS interpretation were accepted, the petitions herein would have been summarily granted without inquiry into the delays in the infants’ adoptions; obviously foster care was initially required for a baby for whom no caretaker was available at birth. By the time of these section 358-a proceedings however, four to nine months of foster care had elapsed, the filing of many section 358-a petitions being substantially later than the 30 days mandated by statute. If the court failed to consider at the section 358-a hearing the gaps in DSS and agency efforts to advance the infant’s welfare during his months in foster care, there would be no opportunity for judicial concern until the child had been in foster care for a full year and one half, when court review becomes mandatory under another section of the Social Services Law (Social Services Law, § 392, subd 2, par [a]).[3] However, in cases of adopt *127 able infants, more perhaps than any other class of section 358-a cases, a lengthy postponement of judicial consideration of the child’s needs is especially detrimental.
After a brief review of the facts, the reasons for delay, and the orders to the agencies herein, the grounds will be stated for this court’s conclusion that it has the power to issue such orders in section 358-a proceedings.
BASIS FOR DELAYS IN ADOPTIONS
Two months before Jerry D.’s birth, a social worker in the hospital of prenatal care and delivery notified DSS that his mother wanted to place him for adoption; the mother repeated her intention to a DSS worker before his birth and four times over the several months after his birth, on the reasonable grounds that she was unable to care for him, her family would not help her, she did not know the name of the father, and she thought a child should have two parents. After also appearing twice at the foster care agency which cared for the baby under its contract with DSS, she finally disappeared, six months after the baby’s birth, prior to the section 358-a hearing. Her whereabouts are unknown.
Neither DSS nor the foster care agency had at any time offered to let the mother sign an adoption consent form. An adoption cannot be consummated without the execution of such a form, or in the alternative the more cumbersome and time-consuming procedure of the agency’s instituting judicial proceedings for the termination of parental rights. (Domestic Relations Law, § 111.) There was a similar failure to accept a written consent and a similar disappearance of the mother in the case of “Boy” C., who at the age of seven months is still in a temporary rather than an adoptive home, despite his mother’s repeated oral statements of consent to his adoption.
A major reason for the omissions regarding the mothers’ written adoption consents in these cases (and in numerous others that have been before the court), is DSS’ failure to *128 organize and authorize its workers to accept them. Although the DSS representative is the initial caseworker to interview the mother after delivery and customarily continues the contact for a few months, DSS generally assigns the function of accepting written consents to the private foster care agencies, which assume “case-work responsibility” after the initial period.[4] The taking of a written consent tends to become even more protracted and complicated because the agency, before actually accepting it, refers the case back to DSS for its approval of this step.
Besides bureaucratic complexity, a major element in the delay of adoptions, is the social work practice of successive workers trying — each one anew — to work with the mother about her adoption decision and the possibility of her continuing the child in foster care or caring for him herself. This practice may occur, as it did in Joseph M.’s case, no matter how firmly and consistently the mother asserts her desire for her baby’s adoption. Thus, after Joseph’s 20-year-old mother repeated her request for his adoption on at least six occasions over several months before and after his birth, she refused to answer any further phone calls or letters from the agency. At a recalendared section 358-a hearing which she attended, when the boy was 14 months old,[5] it appeared that the caseworker had tried in four interviews to discourage her from following her parents’ proadoption views; she, however, *129 said that she respected and agreed with her parents and wanted no further contact with the caseworkers or the child. During more than a year of foster care for the baby, no consent form was ever proffered to the mother, nor was the boy placed in a preadoptive home.
The counseling practice thus went far beyond efforts to assure the mother’s understanding of the gravity and finality of an adoption consent. Nor is the practice directed at the child’s welfare, for counseling is undertaken even when a change in the adoption decision would because of the mother’s attitude and circumstances bring deprivation to the baby.[6]
ORDERS ISSUED IN SECTION 358-A PROCEEDINGS
Varied orders were issued in these section 358-a proceedings to overcome the persisting delays ip the placement with adoptive parents and in the adoption of the babies here involved. In one case a necessary step was a simple request to an agency caseworker to make a home-visit to the mother rather than to continue to send her unanswered, and perhaps undelivered, letters. (Matter of Raven W.) In the case of 14-month-old Joseph M., whose mother had refused further counseling and who had not been seen by a caseworker for the 10 months prior to the hearing, the agency was ordered to proffer to her in the courthouse the consent form she desired (which she executed forthwith after the hearing). In the cases of mothers who had disappeared without DSS or the agencies proffering consent forms, the court ordered the agencies to file petitions to free the babies for adoption on the ground of a six-month abandonment, pursuant to section 384-b (subd 4, par [b]) of the Social Services Law, and to place them in preadoptive homes.[7] In the case of Boy M., in which an adoption consent was signed when he was five months old, no action was *130 taken towards adoptive placement during the following 10 months. In the section 358-a hearing when the baby was 15 months old, such action was ordered (and he was finally placed in a desirable adoptive home the following month, after undergoing two previous temporary foster placements).* **[8]
DELAY REGARDING FATHERS
Besides the delays relating to the mothers, the agencies’ treatment of the unwed fathers of newborns also postpones their adoptions. New York’s provision that an unwed father had no right to veto his child’s adoption, was amended to reflect the Supreme Court’s decisions in the 1970’s, which established the constitutional rights of unwed fathers who have by their associations with the child “manifested a significant paternal interest” in him. (Caban v Mohammed, 441 US 380, 394.) In the case of infants who like those herein are “placed for adoption” before the age of six months,[9] the adoption statute now provides that an unwed father can veto the mother’s decision if he “openly lived” with her or the child for the preceding six months, holding himself out as the father, and paid a reasonable sum if able, for the medical expenses of the pregnancy and birth. (Domestic Relations Law, § 111, subd 1, par [e].) If a father comes within this category and refuses his consent to the baby’s adoption, no adoption can occur unless an action is successfully concluded to terminate his parental right on the ground of abandonment or another statutory ground for termination.
The agencies, however, reach far beyond the category of fathers with a statutory veto right, and bring termination *131 proceedings against any alleged father named by the mother or even an unnamed father. Thus, a report from the foster care agency in Joseph M.’s case read: “She (the mother) refused to name the father of her child. The Agency is preparing to initiate a proceeding to terminate the parental rights of the unnamed father. Presently, we are nearing completion of a Diligent Search for this individual. Upon completion, Petitions to terminate parental rights will be filed.” Further, some agencies follow the practice of deferring a baby’s placement with adoptive parents until the proceeding to terminate the nonexistent paternal right is brought and concluded (as in the case of Baby M.). An agency with this policy would necessarily delay the adoptive placement of a newborn for at least six months plus the time needed for a court proceeding and order, because the quickest possible termination requires an abandonment for six months. (Social Services Law, § 384-b, subd 4, par [b].) And adding to the delay may be an agency failure to commence the action against the father, even when the appropriate period has run, until the mother’s written consent has finally been accepted.[10]
Certainly neither the Supreme Court nor the New York Legislature envisaged the practice of agencies delaying adoptive placements while proceedings are brought to terminate the parental rights of unwed fathers who have never had any relationship except biological with the child. And the appellate courts have indeed noted the special importance of expeditious adoption of newborns. (See Ca-ban v Mohammed, 441 US 380, 392, supra; Matter of Malpica-Orsini, 36 NY2d 568, 572, opp dsmd sub nom. Orsini v Blast, 423 US 1042.) To remedy the excessive delays that have become the unintended result of the unwed father provisions, orders herein have included a direction to the agency to place the boy with adoptive *132 parents without awaiting the conclusion of any action against the father, in those cases where its institution appeared unnecessary under the adoption statute and its success sure (e.g., Matter of Baby M.).
In sum, if the court were limited in section 358-a proceedings, as DSS contends, to consideration only of the child’s entry into foster care, it would be precluded from reviewing delays in the adoption of newborn infants. The infants would be deprived of the special eligibility for adoption that attaches to healthy newborns, and would forever lose the advantage to their development of expeditious placement in permanent adoptive homes and of early adoption. For reasons stated below, however, the DSS interpretation of the statute appears incorrect.
CONSTRUCTION OF SECTION 358-A OF THE SOCIAL SERVICES LAW AS TO COURT’S POWER
In the only Appellate Division decisions to consider the instant issue of judicial power, the Third Department has rejected the contention that section 358-a proceedings must be limited to the validity of the child’s entry into foster care. (See Matter of Ulster County Dept. of Social Seros, v Irva XX, 57 AD2d 1009, affg Matter of Allen, 88 Misc 2d 265; Matter of John M., 71 AD2d 144.) While the Court of Appeals reversed the John M. order “insofar as appealed from” on the basis of the dissenting opinion of Mr. Justice Herlihy (see 51 NY2d 999, 1001), the appeal related only to the power of the Law Guardian under a provision prohibiting the child’s return to his guardian “ ‘without the concurrence of the Law Guardian’ ”. (71 AD2d, at p 149.)
Since the Court of Appeals relied on Justice Herlihy’s opinion, it is important to note his statement that he would have approved a different form of order as to the Law Guardian, as well as his language indicating that the Family Court had power under section 358-a of the Social Services Law to consider the child’s ongoing welfare and to review a report it had ordered from DSS. In this respect Justice Herlihy’s dissent appears to differ from that of the *133 other dissenting Justice (see Matter of John M.) 71 AD2d 144, 148, supra). Thus, the Court of Appeals ruling gives some intimation of affirmance of the power of the Family Court to consider the needs of the child at the time of the section 358-a hearing and his prospective needs. In any event, the ruling as to the Law Guardian cannot be read as a disapproval of the majority opinion below that the Family Court should have the power to consider the child’s needs at the initial section 358-a hearing when review “would likely be most effective”, rather than only at the later 18-month review held under section 392 of the Social Services Law (see 71 AD2d, at p 146).[11]
PROVISIONS OF SECTION 358-A OF THE SOCIAL SERVICES LAW
Section 358-a (subd [3]) of the Social Services Law authorizes the Family Court to approve DSS’ acceptance of a child into foster care upon certain findings, including a finding “that the best interest and welfare of the child would be promoted by removal of the child from such [his] home”.[12] The statute intends, in this court’s opinion, that consideration be given to the child’s welfare while in foster care, because the question of whether removal to foster care promoted his welfare depends in part upon what happens to him after entry.
Section 358-a (subds [7], [8]) of the Social Services Law supports this court’s view that section 358-a hearings were intended to encompass more than the circumstances at the time of the child’s admission into foster care. Those subdivisions both provide for consideration in section 358-a proceedings of petitions by parents or guardians for return of a child; such consideration and grant or denial of such petitions, obviously involve the child’s needs during foster care. It would be unreasonable to construe a statute enacted to serve child welfare, to authorize consideration of a child’s current needs only when a parent or guardian seeks *134 his return, and to preclude attention to his welfare if, as in the instant cases, he has been abandoned.
FAMILY COURT JUDGE’S DUTIES
The conclusion that the court can and should consider the child’s current needs at the time of a section 358-a hearing, also stems from the statutory powers and duties of a Family Court Judge (to which the Court of Appeals referred in Matter of Sanjivini K., 40 NY2d 1025,1027; and the Appellate Division in Matter of John M., 71 AD2d 144, 145, supra). The Family Court Act is permeated with the parens patriae concept that a Family Court Judge not only has the power to assure the welfare of children who come before him, but — differing from other statutes in this emphasis — also has the duty to do so on his own motion. Section 255 of the Family Court Act provides in part: “It is hereby made the duty of and the family court or judge thereof may order, any agency or other institution to render such information, assistance and cooperation as shall be within its legal authority concerning a child who is or shall be under its care, treatment, supervision or custody as may be required to further the objects of this act.” (See, also, Family Ct Act, §§ 141, 124, 1011, 716, 817.)
The court’s duty, independent of any party’s representation, to consider and remedy a child’s needs is illustrated by Matter of Jacqueline B. (83 AD2d 646) in which the court reversed a Family Court’s dismissal of a petition pertaining to medical neglect, holding that the “Family Court erred by * * * failing to sua sponte order an evaluation of the subject child by a medical expert so that * * * her medical needs could be more accurately assessed, thereby aiding the court in its determination as to the presence or absence of medical neglect.” It would be entirely inconsisent with the Family Court’s powers and duties and anomalous among Family Court proceedings, for the court to limit its inquiry into the child’s interests to the circumstance that triggered his entry into foster care some months before the section 358-a hearing. And the grant of jurisdiction over section 358-a proceedings to the Family Court, necessitates interpretation of the section in the context of the Family Court Act.
*135 Section 358-a of the Social Services Law has some ambiguities and gaps — for example, though it is intended to cover all foster care cases, its wording omits proceedings like the instant ones where babies are placed directly in care from the hospital. The ambiguities must be resolved in the light of the statutory purpose of advancing the welfare of children, of the State’s policy of sparing the child from an “ ‘unnecessarily protracted’ ” period of foster care (see Matter of Hime Y., 54 NY2d 282, 286), and of this court’s duty of avoiding fragmentation and delay in making “appropriate provision for her [the child’s] welfare” (Matter of Sanjivini K., 40 NY2d 1025, 1027, supra). All these considerations argue for construction of section 358-a of the Social Services Law as empowering the court to review the child’s needs at the time of the hearing and to order appropriate remedies.

. Unlike many adoptions of older or handicapped children, adoptions of newborns are accomplished without government subsidies.

. This DSS contention is at issue in a pending appeal from an order of this Judge. See Matter of Damon A. (App Div, 1st Dept).

. For example, the mother of Tanya V. (K-7259/81) had requested her adoption at birth and abandoned her in the hospital of delivery. No orders were made in the section *127 358-a proceeding; in the judicial review after 18 months of foster care, this court found that the baby still has not been placed in an adoptive home.

. While DSS officials have repeatedly stated an intention to change this practice, a DSS worker testified a week ago in the case of Jerry D., that he failed to take the mother’s written consent because only the foster care agency was authorized to do so. While in occasional cases a DSS worker has effectively and promptly accepted a consent and the baby has been promptly placed for adoption, there is no uniformity in this practice and no directive establishing clear lines of authority.
Delay can occur though the child is maintained, as a minority are, in foster care administered directly by DSS; in the case of Iris S., although adoptive placement was requested at birth by both the mother and the alleged father, a consent was not executed for a year, apparently because of the difficulty in communication between various DSS offices.

. The case was recalendared by a representative of a unit known as court appointed special advocates (or CASA), a foundation-funded nonlawyer group which renders invaluable assistance to the court in foster care cases. It had been assigned “to monitor” this case when the section 358-a petition had been granted when the baby was 10 months old. (The court’s present practice is to give CASA workers more formal status by appointing them as guardians ad litem.)

. See, e.g., Matter of “Boy” C., who was born with cocaine in his urine. The mother was a hard-drug user, was living on public assistance with children 4 and 2 (both born with withdrawal symptoms). She stated that the name of the father was unknown to her because of the number of men with whom she had intercourse at the time of conception, and was firm in her request for her baby's adoption at the time of his birth and a month thereafter.

. The same order was made in Michael H.’s case; there the mother expressed no intention regarding the infant, before she left him at the hospital of delivery. There has *130 been no contact between her and the agency to the present day, a period of eight months of foster care for Michael, except for a phone call when he was six months old in which she refused the agency’s invitation to visit him.

. In the case of Iris S. in which the completion of the baby’s unsubsidized and desirable adoption by her foster parents had been delayed for a year by bureaucratic confusion, the order was to DSS to forward forthwith to the parents’ attorney the papers required for completion of the adoption.
Since many of the adoption-of-newborn cases concern black infants, the results belie the popular view that there are no adoptive homes for healthy newborn black infants.

. While these infants were not placed in adoptive homes before the age of six months, they were all placed by their mothers in foster care when a few days old for the purpose of adoption.

. Ironically, children placed for adoption through the DSS foster care system fare much worse with regard to delays in their adoptive placement than babies who are placed privately through obstetricians, lawyers or other individuals. In the latter instances the baby of a mother who gives an informed and knowledgeable consent to adoption, is taken home by adoptive parents directly from the hospital of delivery; and any search for the father mandated by statute is generally conducted subsequently, during the proceedings to complete the adoption.

. While the need under consideration in John M. (71 AD2d 144) was the need for continued foster care, it seems clear that the Appellate Division holding as to the Family Court’s power was intended to apply broadly to all classes of section 358-a cases.

. This language has been freely interpreted, without objection, to include cases like the instant ones, where the child has never been in a home and is placed directly from the hospital of delivery.