■ In the Matter of ROXANN JOYCE M., a Child Alleged to be Permanently Neglected. CATHOLIC GUARDIAN SOCIETY OF THE DIOCESE OF BROOKLYN, INCORPORATED, Appellant; NICHOLAS M. et al., Respondents.—In a permanent neglect proceeding pursuant to article 6 of the Family Court Act, the petitioner, Catholic Guardian Society of the Diocese of Brooklyn, Inc., appeals from an order of the Family Court, Kings County, dated February 2, 1979, which, after a hearing, dismissed the petition on the ground that the respondent father had been denied his due process rights when he was not informed that his parental rights could be severed if he failed to plan for the future of the child (see Social Services Law, § 384-b, subd 7, par [a]). Order reversed, on the law and the facts, without costs or disbursements, the child is adjudicated to be permanently neglected, and the matter is remitted to the Family Court, Kings County, for an immediate dispositional hearing pursuant to section 631 of the Family Court Act. The record establishes that the parents had sufficient notice of their statutory obligations to satisfy their due process rights. The trial court's concern with that issue is commendable, but misplaced. We therefore reach the issue of whether the Catholic Guardian Society of the Diocese of Brooklyn (hereafter the agency) established, by a fair preponderance of the competent, material evidence (see Family Ct Act, §§ 622, 624), that there was a failure of the parents for more than one year to maintain contact with *or* plan for the future of the child, *and* that the agency made diligent efforts to encourage and strengthen the parental relationship, except when such efforts would have been detrimental to the best interests of the child (see Social Services Law, § 384-b, subd 7, par [a]). We conclude that on the record the agency proved its case. Roxann was born on March 14, 1968 and was placed by her parents in foster care less than two months later, in May, 1968. Three older siblings (two sisters and a brother) were also placed in foster care about that time, but not with Roxann. A petition brought by the parents in 1973 to have custody of the children restored to them was denied. The travail afflicting this family was noted by the court that denied the petition. Among other factors, the mother experienced severe disturbances requiring hospitalization and the three older siblings are mentally retarded. The trial court concluded that the parents at that time were unable to care for the children and that their behavior was detrimental to the children's well-being (see *Matter of Nathan M. v Catholic Guardian Soc.*, 76 Misc 2d 1003). The agency interpreted this to mean, according to the supervisor who testified in the instant proceeding, that visitation with the natural parents should not be promoted. In 1976 the father again petitioned for the return of the children. The petition was evidently dismissed, upon consent, when the agency agreed to reinstitute visitation. The father told the supervisor that he was now divorced from the children's mother so that the problems created by her in the household no longer existed. "Family visiting" at the agency was arranged in 1976. In early 1977 the supervisor visited the father's home and spoke with a woman whom the father proposed as a homemaker. A month later, the supervisor discussed with the father the

fact that a second homemaker had been proposed by the father. The father's response was that he would ultimately choose which of the two women he would marry. The supervisor interviewed the second woman. The natural mother told the supervisor that she did not want Roxann adopted; she wanted her to remain in foster care. The resumed visitation was not successful so far as Roxann was concerned. She refused to visit and kept only two appointments in 1977. The agency supervisor proposed that the father talk to the agency psychiatrist to devise a way to bridge the estrangement. This the father declined to do, although he offered to see a different psychiatrist. No arrangement could be agreed upon. Roxann was interviewed by the agency psychiatrist. By petition dated November 23, 1977 the agency instituted this neglect proceeding, and sporadic hearings were held from January, 1978 to January 10, 1979. The father's testimony was that he was "slightly" aware of Roxann's attitude toward visiting him. He has a suitable apartment and there is a public school in the neighborhood. Notwithstanding the fact that it was upsetting for Roxann to see him, the father testified that if he could, he would take her home with him that day. Parental rights may not be terminated by a court "by offering a child for adoption when there has been no parental consent, abandonment, neglect or proven unfitness, even though some might find adoption to be in the child's best interest" *(Matter of Sanjivini K.,* 47 NY2d 374, 382). Our conclusion that the record established permanent neglect rests first on the agency's proof that it made "reasonable attempts * * * to assist, develop and encourage a meaningful relationship between the parent and child" except when such efforts would have been detrimental to the best interests of the child (see Social Services Law, § 384-b, subd 7, pars [a], [f]). The agency did not block or impede the discharge of the child, as occurred in *Matter of Sanjivini K.* (47 NY2d 374, *supra)* and in *Matter of Leon RR* (48 NY2d 117). In the present case the child was not returned to her parents in the early years of her placement for reasons outside the agency's control. Second, the record establishes that the father's plan for the return of the child was neither realistic nor feasible (see Social Services Law, § 384-b, subd 7, par [c]). The father's plan did not include any measures to establish a relationship with his child after all the time that had elapsed, viz., her entire life. The planning requirement is not to be used to terminate parental rights by evaluating the adequacy of the parents' plans at an unrealistically high level *(Matter of Orlando F.,* 40 NY2d 103, 111). But any plan that ignores the strong psychological ties that the child has formed with her foster parents is unrealistic (cf. *Matter of Donna Dorene G,* 70 AD2d 188). The father's plan here was entirely uncomprehending of the situation that, in fact, exists. Although the lapse of time was perhaps as much outside the father's control as it was outside the agency's, a failure to recognize and to plan ways to bridge the estrangement is evidence of the permanent neglect defined by the statute. We infer from the record that the agency did not attempt to prove that the father had failed to maintain contact with the child. It was not required to do so if it established a failure to plan (see Social Services Law, § 384-b, subd 7, par [a]; *Matter of Orlando F., supra).* Gulotta, J. P., Cohalan, Margett and O'Connor, JJ., concur. [99 Misc 2d 390.]