712 F.2d 770
 Jay Andrew JOYNER, By his attorney and next friend, Marcia
Robinson LOWRY, and John Marshall, by his attorney and next
friend, Marcia Robinson Lowry, on behalf of themselves and
all others similarly situated, Plaintiffs-Appellees,
v.
James DUMPSON, Individually and as Administrator of the New
York City Human Resources Administration, and as
Commissioner of the New York City Department of Social
Services, Carol Parry, Individually and as Assistant
Administrator for special services for children; Bernard
Shapiro, Individually and as Executive Director of the New
York State Board of Social Welfare; and Barbara Blum,
Individually and as Commissioner of the New York State
Department of Social Services, Defendants,
Barbara Blum, Commissioner of the New York State Department
of Social Services, Defendant-Appellant.
 No. 707, Docket 82-7683.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 20, 1983.
Decided June 29, 1983.
 
 Amy Juviler, Asst. Atty. Gen., State of N.Y., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Andrea Green, Asst. Atty. Gen., State of N.Y., New York City, of counsel), for defendant-appellant.
 George Kannar, Children's Rights Project, American Civil Liberties Union, New York City (Marcia Robinson Lowry, Children's Rights Project, American Civil Liberties Union, New York City, of counsel), for plaintiffs-appellees.
 Before MANSFIELD and MESKILL, Circuit Judges, and NEAHER,* District Judge.
 MESKILL, Circuit Judge:
 This is an appeal from a successful challenge in the United States District Court for the Southern District of New York, Gagliardi, J., to the constitutionality of sections 358-a and 384-a of the New York Social Services Law (McKinney Supp.1982) which require that parents who wish to obtain state-subsidized residential care for their children must transfer temporary custody of the children to the state. The plaintiffs' class is composed of approximately 5,000 New York children in need of special residential services[1] whose parents cannot afford the cost of such out-of-home treatment. Joyner v. Dumpson, 75 Civ. 35 (S.D.N.Y. Oct. 22, 1975) (unpublished order certifying the class). Plaintiffs brought a declaratory judgment action alleging that sections 358-a and 384-a,[2] both facially and as applied, violate their substantive due process rights protected by the Fourteenth Amendment to the United States Constitution, violate Title IV of the Social Security Act, 42 U.S.C. § 601 et seq. (Social Security Act), and violate section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp. V 1981) (Rehabilitation Act). The district court granted plaintiffs' motion for partial summary judgment and denied defendant New York Social Service agencies' cross-motion for partial summary judgment on the grounds that the custody transfer requirement discriminated against handicapped children by denying them access to residential care at state expense in violation of the Rehabilitation Act and infringed the plaintiffs' fundamental right to "family integrity" without sufficient justification, thereby violating their substantive due process rights under the Fourteenth Amendment.[3] Joyner v. Dumpson, 533 F.Supp. 233, 242 (S.D.N.Y.1982).
 We disagree with both of the district court's conclusions. We hold that the custody transfer requirement does not violate the Rehabilitation Act because it does not discriminate against handicapped children "solely on the basis of their handicaps." 29 U.S.C. § 794 (Supp. V 1981). Accordingly, we reverse the district court's grant of plaintiffs' motion for summary judgment and grant defendants' cross-motion for summary judgment on this claim. Furthermore, we cannot conclude that the custody transfer requirement infringed plaintiffs' right to "family integrity" because it was the parents' voluntary decision to place their children in state-funded homes rather than the state's action that disrupted the protected relationship between parent and child. However, as to the constitutionality of New York's custody transfer requirement as applied, genuine issues of material fact exist which render this issue unsuitable for summary adjudication. Consequently, we remand for trial the question of whether New York's application of the custody transfer requirement deprived plaintiffs of their substantive due process rights.
 Reversed and remanded.
 
 BACKGROUND
 
 1
 A brief outline of New York's foster care system is a necessary preface to a discussion of the constitutional and statutory issues that we must decide. The New York Social Services regulations define "foster care" as "all activities and functions provided relative to the care of a child away from his home 24 hours per day in a duly licensed or certified facility." N.Y.Admin.Code tit. 18, § 427.2 (1982). Parents may voluntarily place their children in "substitute homes," and, in fact, most children who enter foster care in New York City are voluntarily placed. See Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 824 & n. 9, 97 S.Ct. 2094, 2099 & n. 9, 53 L.Ed.2d 14 (1977); In re Roxann Joyce M., 99 Misc.2d 390, 392-93, 417 N.Y.S.2d 396, 398 (Fam.Ct.1979), rev'd on other grounds, 75 A.D.2d 872, 428 N.Y.S.2d 264 (App.Div.1980). Voluntary placement is a two-part process. First, the parent and a local social services official enter into a "voluntary placement agreement" (VPA) which transfers care and custody of the child from the parent to an authorized child welfare agency and which sets forth the terms and conditions of the child's care. N.Y.Soc.Serv.Law § 384-a (McKinney Supp.1982). Thereafter, the social services official must obtain judicial approval of the VPA if he expects that the child will remain in custody for more than thirty days. N.Y.Soc.Serv.Law § 358-a (McKinney Supp.1982).
 
 
 2
 Parents are allowed to designate in the VPA a date for the return of their child. The agency is required to return the child at such time unless prohibited by court order or unless the parent is incapacitated or unavailable. See Ruth "J" v. Beaudoin, 55 A.D.2d 52, 54, 389 N.Y.S.2d 473, 474 (App.Div.1976). Moreover, upon written notice to the agency, the parent may request the return of the child at any time prior to the date identified in the VPA. The agency must respond within ten days after receiving this request, but is empowered to deny early return of the child. If denied, the parent can petition the family court for an order to show cause or institute a habeas corpus proceeding in family court or in the supreme court. See N.Y.Soc.Serv.Law §§ 358-a(7), 384-a(2)(a) (McKinney Supp.1982); N.Y.Admin.Code tit. 18, § 430.5 (1982).
 
 
 3
 In drafting the VPA, the social services official must ensure that the parent is advised of all of his rights, including the right to designate a return date, the right to supportive services, to visit the child and to have the child returned and the right to consult an attorney at any time including prior to the signing of the VPA. N.Y.Soc.Serv.Law § 384-a(2)(c)(i), (ii), (v) (McKinney Supp.1982). See In re Roxann Joyce M., 99 Misc.2d at 395-96, 417 N.Y.S.2d at 400. The parent must also be made aware of his obligation "(A) to visit the child, (B) to plan for the future of the child, (C) to meet with and consult the agency about such plan, (D) to contribute to the support of the child to the extent of his or her financial ability to do so, and (E) to inform the agency of any change of name and address." N.Y.Soc.Serv.Law § 384-a(2)(c)(iii) (McKinney Supp.1982).
 
 
 4
 Following execution of the VPA, if the social services official believes the child is likely to remain in state care in excess of thirty days, the official must petition the local family court judge to approve the VPA. N.Y.Soc.Serv.Law § 358-a(1) (McKinney Supp.1982). The judge must be satisfied that (1) the parent "knowingly and voluntarily" executed the VPA; (2) the parent was "unable to make adequate provision for the care, maintenance and supervision" of the child at home; (3) the requirements of section 384-a, if applicable, have been satisfied; (4) "the best interest and welfare of the child would be promoted by removal of the child from such home, and that it would be contrary to the welfare of such child for him to continue in such home." N.Y.Soc.Serv.Law § 358-a(3) (McKinney Supp.1982). If the judge believes that the petition satisfies these four prerequisites, he shall "grant the petition and approve such instrument and the transfer of the ... care and custody of such child to such social services official." N.Y.Soc.Serv.Law § 358-a(3) (McKinney Supp.1982). The statute further provides that any order of a family court judge granting or denying a petition for transfer or return of custody shall be appealable. N.Y.Soc.Serv.Law § 358-a(8) (McKinney Supp.1982).DISCUSSION
 
 I. Rehabilitation Act
 
 5
 The plaintiffs' summary judgment motion asserted that New York's custody transfer requirement denied them benefits on the basis of their handicaps in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp. V 1981), because it deterred parents from placing their children in residential care and therefore adversely impacted on handicapped children. The district court found that plaintiffs had indeed established a prima facie case of handicap discrimination in violation of the Rehabilitation Act. As a result, the burden of proof shifted to the state to show substantial justification for the custody transfer requirement. See New York State Association for Retarded Children, Inc. v. Carey, 612 F.2d 644, 649 (2d Cir.1979) ("It is a general principle of discrimination law that once the plaintiff has established a prima facie case that he has been discriminated against, the defendant must present evidence to rebut the inference of illegality."). Upon finding that the defendants failed to carry this burden, the court ruled that "the requirement that custody be transferred prior to the admission of the handicapped children comprising the plaintiff class to residential treatment centers violates § 504 of the Rehabilitation Act of 1973." 533 F.Supp. at 239.
 
 
 6
 Our inquiry is twofold: whether the court employed the correct legal standard for finding a violation of the Rehabilitation Act and whether any genuine issues of material fact precluded summary adjudication of this issue.
 
 
 7
 First, we believe that the district court engaged in an incomplete and misguided Rehabilitation Act analysis and therefore erred in finding that plaintiffs had established a prima facie case of discrimination. Section 504 provides in pertinent part:
 
 
 8
 No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ....
 
 
 9
 29 U.S.C. § 794 (Supp. V 1981) (emphasis added). In Doe v. New York University, 666 F.2d 761 (2d Cir.1981), we determined that a prima facie violation of the Rehabilitation Act required proof that (1) the plaintiffs are "handicapped persons" under the Rehabilitation Act;[4] (2) they are "otherwise qualified" for the program; (3) they are excluded from benefits "solely" because of their handicaps; and (4) that the program or special service receives federal funding. Id. at 774-75. Here the district court found that the plaintiffs had demonstrated a prima facie violation of the Rehabilitation Act by showing that (1) they were "indisputably handicapped;" (2) they were denied access to needed residential care; and (3) the defendants' assistance programs were supported in part by federal funding. 533 F.Supp. at 238 & n. 6. In so doing, the court overlooked a crucial element of the test. The court made no inquiry into or express findings of whether plaintiffs were denied benefits "solely" by reason of their handicaps. Consequently, the court's analysis was deficient. See Monahan v. Nebraska, 687 F.2d 1164, 1170 (8th Cir.1982) (emphasizing that a Rehabilitation Act violation turns on a finding of discrimination "solely" on the basis of handicap); Bernard B. v. Blue Cross and Blue Shield of Greater New York, 528 F.Supp. 125, 132 (S.D.N.Y.1981), aff'd mem., 679 F.2d 7, 8 (2d Cir.1982) (per curiam); see also Doe v. Devine, 545 F.Supp. 576, 585 & n. 11 (D.D.C.1982).
 
 
 10
 Instead of adhering to the traditional four-prong Rehabilitation Act analysis, the court gave inordinate weight to regulations promulgated pursuant to the Act.[5] The pertinent regulations state:(a) General. In providing health, welfare, or other social services or benefits, a recipient may not, on the basis of handicap:
 
 
 11
 ....
 
 
 12
 (2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered nonhandicapped persons;
 
 
 13
 ....
 
 
 14
 (4) Provide benefits or services in a manner that limits or has the effect of limiting the participation of qualified handicapped persons ....
 
 
 15
 34 C.F.R. § 104.51 (1980); 45 C.F.R. § 84.52 (1980) (emphasis added). Basing their primary argument on these regulations, plaintiffs asserted that the custody transfer requirement exerted an adverse "disparate impact" on handicapped children by limiting their "access to needed benefits and discourag[ing] their use of needed benefits in direct violation of § 504." 533 F.Supp. at 238. The district court was persuaded by this expansive interpretation of the Rehabilitation Act and found it to be undisputed "that the pre-condition of custody transfer does in fact discourage and deter plaintiffs' parents from placing their children in residential care centers."[6] Id. Consequently, the district court shifted the burden of justification to the defendants.
 
 
 16
 Although an agency's consistent, longstanding interpretation of the statute under which it operates is entitled to considerable deference, we recently held that "this Court will not interpret an agency regulation to thwart a statutory mandate." Insurance Company of North America v. Gee, 702 F.2d 411, 414 (2d Cir.1983); see Southeastern Community College v. Davis, 442 U.S. 397, 411-12, 99 S.Ct. 2361, 2369-70, 60 L.Ed.2d 980 (1979) (the Supreme Court intimated that section 504 compliance regulations, if interpreted too broadly, may constitute improper standards for determining section 504 violations); International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979) ("this deference [to administrative interpretations] is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history"). Here the Rehabilitation Act nowhere mentions an "adverse disparate impact" test when it precludes federal programs from discriminating "solely" on the basis of handicap. Furthermore, one court has expressly rejected the "disparate impact" theory of recovery under the Rehabilitation Act.[7] Pushkin v. Regents of the University of Colorado, 658 F.2d 1372, 1385 (10th Cir.1981) ("the statute itself does not contemplate ... a disparate impact analysis.... § 504 sets forth its own criteria for scrutinizing claims"); see Doe v. New York University, 666 F.2d at 774-75 (applying four-prong test); New York State Association for Retarded Children, Inc. v. Carey, 612 F.2d at 649 (applying four-prong test); Bernard B v. Blue Cross and Blue Shield of Greater New York, 528 F.Supp. at 132 (applying four-prong test). Thus, we believe that the district court erred in finding that plaintiffs' adverse impact theory sufficed to state a prima facie violation of the Rehabilitation Act.
 
 
 17
 Ultimately, the district court rested its grant of plaintiffs' motion for summary judgment on defendants' inability to justify the custody transfer requirement. 533 F.Supp. at 238-39. Because the court never should have reached this point in its analysis, we must reverse its grant of summary judgment in favor of the plaintiffs. Instead, we grant the defendants' cross-motion for summary judgment. See 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice p 56.13, at 56-348 (2d ed. 1982) (upon concluding that there are no genuine issues of material fact, the appellate court is empowered to grant either party's motion for summary judgment). Mourning v. Family Publications Service, Inc., 449 F.2d 235, 243 (5th Cir.1971), rev'd on other grounds, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); see also Abrams v. Occidental Petroleum Corp., 450 F.2d 157, 165 (2d Cir.1971), aff'd sub nom. Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).
 
 
 18
 Plaintiffs have not shown that the New York social services regulations and statutes, either on their face or as applied, are inconsistent with the terms of or policies underlying the Rehabilitation Act. Plaintiffs relied on two theories to support their motion for summary judgment. First, they argued that New York's foster care program discriminated between handicapped and non-handicapped children in the provision of "special services." They claimed that New York's foster care system discriminated by providing nonhandicapped children with a variety of state-subsidized services without forcing them to submit to state custody, while requiring that handicapped children submit to state custody as a prerequisite to receipt of residential care. Yet, plaintiffs have produced no testimonial or documentary evidence to show that New York requires all handicapped children who receive "special services" at state expense to submit to state custody. Rather, the New York social service regulations provide handicapped children with virtually every type of special rehabilitative service without any requirement that custody be transferred. See N.Y.Admin.Code tit. 18, §§ 423.1, 423.3, 425.1, 425.2 (1982). A transfer of custody is only required when a child is placed in "foster care." See N.Y.Soc.Serv.Law § 358-a (McKinney Supp.1982). In short, all parents whose children need state-subsidized "home substitutes" must transfer temporary custody to the state, regardless of whether the child is or is not handicapped. The New York statutes and regulations overwhelmingly demonstrate that New York's foster care scheme discriminates between children only as to the type of assistance needed and not solely on the basis of their handicaps.
 
 
 19
 Plaintiffs' second claim was that New York's foster care system discriminates among handicapped persons by requiring that only children with certain types of handicaps must submit to state custody in order to receive residential care. As support for this claim they point to N.Y.Educ.Law §§ 4401-4409 (McKinney 1981 & Supp.1982) which allows learning disabled children in need of special educational services to obtain state-subsidized residential care without submitting to state custody. In contrast, a physically or psychologically disabled child must submit to state custody in order to obtain foster care.
 
 
 20
 However, plaintiffs cannot rely on this argument as the basis for their Rehabilitation Act claim. During the course of this litigation, the parties agreed to narrow the issues in dispute and in so doing excluded the question of "educational services" from the lawsuit:
 
 
 21
 the sole legal issue to be decided in this case is whether it may lawfully be required that the custody of those children in New York State who require services in addition to education outside their homes which their parents cannot provide be transferred to the temporary custody of the local social services commissioner ....
 
 
 22
 IT IS FURTHER STIPULATED AND AGREED that resolution of this issue does not depend upon the particular allegations by plaintiff Jay Andrew Joyner as to his ability to be educated in the New York City schools ....
 
 
 23
 Joyner v. Dumpson, 75 Civ. 35 (S.D.N.Y. May 8, 1979) (stipulation) (emphasis added). Consequently, the Rehabilitation Act claim in this lawsuit concerns only those children who need state-subsidized residential services exclusive of education. Plaintiffs have produced no evidence to show that within this class the state discriminates against children on the basis of their handicaps. They have not demonstrated that the state prohibits children with certain types of physical, psychological or emotional infirmities from entering residential care centers. Nor have they shown that only children with certain types of infirmities must submit to state custody in order to receive residential care.
 
 
 24
 After reviewing both parties' cross-motions for summary judgment, we cannot discern any disputed issues of material fact that would suggest that New York's statutory foster care system discriminates on the basis of handicap. Consequently, we hold that on this record as a matter of law the New York foster care statutes do not violate the Rehabilitation Act.
 
 II. Substantive Due Process
 
 25
 Plaintiffs contend that New York's custody transfer requirement, as embodied in N.Y.Soc.Serv.Law, §§ 358-a and 384-a (McKinney Supp.1982),[8] is facially unconstitutional because it infringes their right to substantive due process protected by the Fourteenth Amendment to the United States Constitution.[9] "For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined." Lassiter v. Department of Social Services, 452 U.S. 18, 24, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981). Yet, we have generally relied on a three-step test to guide our consideration of substantive due process claims. See, e.g., Zablocki v. Redhail, 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978). First, we examine the nature of the interest at stake to discern whether it is a "fundamental right" within the Fourteenth Amendment's protection of liberty and property. See, e.g., Moore v. City of East Cleveland, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion). Second, we determine whether the state's action has significantly infringed that "fundamental right." See, e.g., Harris v. McRae, 448 U.S. 297, 314-15, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784 (1980). Third, we analyze whether an important state interest justifies the infringement. See, e.g., Zablocki v. Redhail, 434 U.S. at 388, 98 S.Ct. at 682.
 
 
 26
 Here plaintiffs claim that the custody transfer requirement infringed their fundamental right to "family integrity"--"the right of the family to remain together without the coercive interference of the awesome power of the state." Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir.1977). Engaging in the traditional due process analysis, the district court examined the nature of this interest and concluded that it is indeed a fundamental, constitutionally-protected right. 533 F.Supp. at 239. We agree. See Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978); Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 845, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977); Moore v. City of East Cleveland, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion); Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974); Stanley v. Illinois, 405 U.S. 645, 651-52, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551 (1972); Prince v. Massachusetts, 321 U.S. 158, 164-66, 64 S.Ct. 438, 441-42, 88 L.Ed. 645 (1944); Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).
 
 
 27
 The court then inquired whether New York's custody transfer requirement significantly infringed this fundamental right. Plaintiffs argued that by conditioning their receipt of residential care on a transfer of "custody," the New York foster care scheme necessarily forced them to sacrifice their right to family privacy and integrity. The district court agreed and held that "the right of the parent to rear and retain custody of his children is one aspect of that fundamental right [to family integrity]." 533 F.Supp. at 239.
 
 
 28
 We disagree with the district court's conclusion for three reasons. First, the district court incorrectly assumed that a transfer of "custody" would deprive parents of all rights to "rear" their children. Our scrutiny of the New York case law demonstrates that a transfer of "custody" pursuant to New York's foster care statutes does not result in parents' wholesale relinquishment of their right to rear their children. Second, the district court made no reference to the New York social services regulations which govern the temporary foster care system. Yet, it appears that the whole orientation of that system is to try to keep the natural family together. Third, although the remedy sought by the plaintiff class is a declaration that they have the right to tailor state-subsidized programs to suit their own needs, we do not believe that the state is obligated to contour voluntary social service programs such as residential foster care to accord with the desires of each of the participants.
 
 A. Definitions of Custody
 
 29
 Plaintiffs claim that the custody transfer requirement infringes family integrity by effecting a "substantial transfer of responsibility with regard to important decisions in a child's life about which a parent might not even be informed and which a parent could contest only by seeking to remove the child from needed services altogether." Br. for Appellees at 16. Our review of both federal and New York decisions defining "custody" belie this assertion.
 
 
 30
 The Supreme Court recently reviewed New York's foster care statutes in upholding the constitutionality of the procedures for removing children from foster homes. Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (OFFER ). Rather than viewing "custody" as the responsibility for rearing a child, the Court defined "custody" as simply the "day-to-day supervision of the child." Id. at 827, 97 S.Ct. at 2100. The Court noted that " '[l]egal custody is concerned with the rights and duties of the person (usually the parent) having custody to provide for the child's daily needs--to feed him, clothe him, provide shelter, put him to bed, send him to school, see that he washes his face and brushes his teeth.' " Id. at 827 n. 17, 97 S.Ct. at 2101 n. 17 (quoting A. Kadushin, Child Welfare Services, 354-55 (1967)). The Court expressly recognized that not all parental prerogatives are lost with a temporary transfer of legal custody. Rather,
 
 
 31
 the natural parent's placement of the child with the agency does not surrender legal guardianship;[19] the parent retains authority to act with respect to the child in certain circumstances.[20] The natural parent has not only the right but the obligation to visit the foster child and plan for his future ....
 
 
 32
 20. "[A]lthough the agency usually obtains legal custody in foster family care, the child still legally 'belongs' to the parent and the parent retains guardianship...."
 
 
 33
 19. Voluntary placement in foster care is entirely distinct from the "surrender" of both "the guardianship of the person and the custody" of a child under Soc.Serv.Law § 384, which frees the child for adoption. § 384(2) ....
 
 
 34
 OFFER, 431 U.S. at 827-28 & n. 19-20, 97 S.Ct. at 2100-01 & n. 19-20.
 
 
 35
 New York state court decisions that discuss the term "custody" echo the Supreme Court's observations in OFFER. These decisions do not equate a transfer of "custody" with a total relinquishment of parental prerogatives. In Roland F. v. Brezenoff, 108 Misc.2d 133, 436 N.Y.S.2d 934 (Fam.Ct.1981), the Family Court of New York County held that execution of a voluntary placement agreement pursuant to N.Y.Soc.Serv.Law § 384-a "does not and should not have the legal effect of surrender, abandonment, persistent neglect or unfitness." 108 Misc.2d at 135, 436 N.Y.S.2d at 936; see Dodd v. Dodd, 93 Misc.2d 641, 403 N.Y.S.2d 401, 407 (Sup.Ct.1978) (requiring consultation with noncustodial parent); In re Allen, 88 Misc.2d 265, 267, 387 N.Y.S.2d 185, 186-87 (Fam.Ct.1976), aff'd, 57 A.D.2d 1009, 394 N.Y.S.2d 498 (App.Div.1977). Similarly, the Family Court for Kings County stressed that the New York State Department of Social Services must ensure that the parent who relinquishes temporary custody of his child is apprised of his continuing rights and obligations with respect to "rearing" the child. In re Roxann Joyce M., 99 Misc.2d 390, 395-96, 417 N.Y.S.2d 396, 400 (Fam.Ct.1979), rev'd on other grounds, 75 A.D.2d 872, 428 N.Y.S.2d 264 (App.Div.1980); see also Rockland County Department of Social Services v. Brust, 102 Misc.2d 411, 413, 423 N.Y.S.2d 435, 436 (Fam.Ct.1979) (the parents' obligation to support the child survives despite the execution of a VPA).
 
 
 36
 These decisions clearly demonstrate that a transfer of "custody" pursuant to New York's foster care statutes does not result in parents' wholesale relinquishment of their right to rear their children. Consequently, the district court relied on an erroneous assumption in concluding that New York's custody transfer requirement necessarily infringed plaintiffs' fundamental right to family integrity.
 
 B. New York Social Services Regulations
 
 37
 In holding that New York's transfer of custody requirement was facially unconstitutional, the district court did not give full effect to the New York social services regulations which guide the temporary foster care system. These guidelines demonstrate that instead of infringing family integrity, the system protects the parent-child relationship. In fact, the expressed central policy of the New York foster care system is that "it is generally desirable for the child to remain with or be returned to the natural parent because the child's need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interest of the child would be thereby endangered." N.Y.Soc.Serv.Law § 384-b(1)(a)(ii) (McKinney Supp.1982); N.Y.Admin.Code tit. 18, § 430.10 (1982).
 
 
 38
 When a parent seeks to place a child in a state-subsidized institution, the local social services official must first determine whether the needed services can be provided without residential placement, in other words, without disrupting family unity. N.Y.Soc.Serv.Law §§ 398-b, 409 (McKinney 1975 & Supp.1982); N.Y.Admin.Code tit. 18, §§ 423.3, 430.9(c) ("provision of preventive services shall be considered mandated when such services are essential to improve family relationships and prevent the placement of a child into foster care"), 430.10(b)(2), 430.10(c) (1982). Instead of a "substitute home," the social services official may suggest that the child receive "day services" which is a
 
 
 39
 program offering a combination of services, including at least social services, psychiatric, psychological, educational and/or vocational services and health supervision, and also including, as appropriate, recreational and transportation services, for at least 3 but less than 24 hours a day, and at least four days per week, excluding holidays.
 
 
 40
 N.Y.Admin.Code tit. 18, § 425.1(a) (1982). Only if these services do not suffice may foster care be considered. N.Y.Admin.Code tit. 18, § 430.10(b)(2) (1982).
 
 
 41
 Foster care can only be provided "when removal from the home is essential for ensuring [that] the child receives proper care, nurturance, or treatment." N.Y.Admin.Code tit. 18, § 430.10(c) (1982). It is usually the parent, not the state, who initiates this removal determination. If the social services official determines that the child needs such placement, he must describe the behavior which impedes the child's daily activities and must support his findings with a professional diagnosis. N.Y.Admin.Code tit. 18, § 430.10(c)(5)(ii)(a) (1982). Based upon concrete documentation, he must find that "[t]he child has special needs for supervision or services which cannot be adequately met by the child's parents or caretakers, even with the aid of intensive services in the home." N.Y.Admin.Code tit. 18, § 430.10(c)(5)(i) (1982). Even if a child is found to be appropriate for foster care, he may be placed in an institution only "if services or a level of supervision are needed by the child which cannot currently be provided in any other level of care and which can be provided in the institution in which the child is placed." N.Y.Admin.Code tit. 18, § 430.11(d)(4)(i)(b) (1982).
 
 
 42
 Moreover, after the child is placed in an institution, the local district or agency must establish a visitation plan which includes the names of parents and other persons who plan to visit the child on a regular basis. N.Y.Admin.Code tit. 18, § 428.8 (1982). The state provides transportation or other assistance to enable the parent to make the visits, N.Y.Admin.Code tit. 18, § 430.12(d)(1)(i)(a) (1982), and visitation rights cannot be terminated or limited without an amendment of the VPA or a court order. N.Y.Admin.Code tit. 18, § 431.13 (1982).
 
 
 43
 Rather than infringing "family integrity," the self-proclaimed policy of the New York foster care system is to enable "a child who has been placed in foster care to return to his family at an earlier time than would otherwise be possible; or reducing the likelihood that a child who has been discharged from foster care would return to such care." N.Y.Soc.Serv.Law § 409 (McKinney Supp.1982); N.Y.Admin.Code tit. 18, § 430.10 (1982). These social services regulations reflect deep concern that residential placement of children may strain family ties and represent a serious attempt to avoid the impairment of family integrity. Therefore, the social services regulations constitute strong probative evidence supporting the facial constitutionality of the New York foster care system.
 
 C. Plaintiffs' Right to Unfettered Care
 
 44
 In concluding that the New York foster care statutes breached plaintiffs' right to family integrity, both the plaintiffs and the district court conveniently overlooked the voluntary nature of the temporary foster care system. Here the parent-child relationship is not severed by the "coercive interference of the awesome power of the state." Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir.1977). Rather, this case involves parents who want their children to enjoy the benefits of a voluntary state-subsidized program while they retain the right to dictate how the service should be administered. In essence, plaintiffs read the Fourteenth Amendment's Due Process Clause so broadly as to render prima facie unconstitutional any strictures in a voluntary social welfare program which have an incidental effect on family life. We know of no authority for such a position.
 
 
 45
 In fact, in Black v. Beame, 550 F.2d 815 (2d Cir.1977), we rejected a similar argument. In Black, the plaintiffs were nine brothers and sisters who claimed that New York City and state welfare officials had violated their Fourteenth Amendment rights by "misallocating welfare resources and thereby failing to provide housing and services sufficient to keep the Black family together." Id. at 816. Plaintiffs proposed a plan aimed at reuniting their family which would require hiring "a part-time social worker, who could aid Mrs. Black in locating a larger home, finding jobs for herself and her older children, and coping with other transitional problems." Id. The district court dismissed the complaint for failure to state a claim upon which relief could be granted. We affirmed, noting that "the fourteenth amendment does not afford a basis for a court to engage in the sorts of fiscal and psychological speculations [about the effect of the welfare system on family integrity]." Id. at 817.
 
 
 46
 Similarly, New York State is under no constitutional obligation to provide state-subsidized residential care. See Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970); New York State Association for Retarded Children, Inc. v. Rockefeller, 357 F.Supp. 752, 761 (E.D.N.Y.1973). Consequently, when the state does provide voluntary social services, it can administer the program without having to consult and satisfy the individual concerns of each of the recipients. See Vander Malle v. Ambach, 673 F.2d 49, 52 (2d Cir.1982) (the state is not required "to undertake payments for continuation of a child's placement that has been selected unilaterally by the parents").
 
 
 47
 Additionally, the Supreme Court's reasoning in Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), supports our rejection of plaintiffs' substantive due process claim. In Harris, the issue was whether the Hyde Amendment, which denied public funding for certain medically necessary abortions, contravened plaintiffs' substantive due process rights protected by the Fifth Amendment's Due Process Clause. The plaintiffs-appellees contended that an indigent woman's fundamental right to choose whether to terminate her pregnancy by abortion was "penalized" by the state's refusal to subsidize certain medically necessary abortions. The Supreme Court rejected this argument on the grounds that indigent persons have no constitutional entitlement to subsidized welfare programs. The Court stated that "[a]lthough the liberty protected by the Due Process Clause affords protection against unwarranted interference with freedom of choice in the context of certain personal decisions, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." Id. at 317-18, 100 S.Ct. at 2688.
 
 
 48
 Here we are confronted with the same issue in a different context. Rather than freedom of choice, the question here is whether a person's right to family integrity is abridged when the state places restrictions on its provision of voluntary social programs. Echoing the Supreme Court's holding in McRae, we reject plaintiffs' assertion that the state's manner of providing social services has unduly interfered with their exercise of fundamental, constitutionally-protected rights. New York has not been straining family ties by either removing children from their homes or forcing children to participate in state-funded programs. Rather, the state has simply subsidized a voluntary social service program and allowed each family to decide whether that service satisfies their needs. The severing of family ties cannot be attributed to the state's administration of the program, but can be attributed to the parents' placement of the child in the program. Cf. Duchesne v. Sugarman, 566 F.2d 817, 827 (2d Cir.1977). Therefore, we cannot conclude that the state's custody transfer requirement "significantly infringed" plaintiffs' fundamental right to family integrity.
 
 
 49
 In finding that plaintiffs have failed to satisfy the second leg of the substantive due process analysis, we need not inquire into the state's justification for its requirement. Rather, we need only observe that as New York's custody transfer requirement does not infringe plaintiffs' fundamental rights, sections 358-a and 384-a of New York's Social Services Laws are not facially unconstitutional.
 
 D. Unconstitutional as Applied
 
 50
 The remaining issue is whether New York administers its facially neutral foster care program in a manner that infringes plaintiffs' substantive due process rights. Plaintiffs contend that New York's application of the custody transfer requirement deprives parents of the power to rear their children. Consequently, they contend that their right to family integrity is infringed by many of defendants' practices including (1) defendants' alleged practice of refusing to return children to their parents until the Commissioner of Social Services is satisfied that the parents are able to care for the child (Deposition of Carol Parry at 19-20[10] ); (2) defendants' alleged practice of refusing parents' requests to modify the boilerplate language of the voluntary placement agreements with respect to such important issues as the return of the child, placement and treatment (Deposition of Carol Parry at 15, Affidavit of Ruth Rogers, p 11-13[11] ); (3) defendants' alleged practice of retaining the ultimate decision-making power as to the child's placement, medical care and rehabilitative treatment (Affidavit of Ruth Rogers, p 17, 9(g), Statement of Facts p 9[12] ); and (4) defendants' alleged practice of strictly controlling visitation, thereby isolating the child and straining familial bonds (Deposition of Carol Parry at 21[13] ). Plaintiffs urge that the absence of any genuine issues of material fact as to these four allegations requires that we conclude as a matter of law that New York's foster care scheme violates the Due Process Clause of the Fourteenth Amendment.
 
 
 51
 After reviewing the affidavits accompanying the cross-motions for summary judgment, we believe that a grant of summary judgment for either party would be inappropriate. The deposition of Robert Page, Director of Foster Care and Adoption for the New York State Department of Social Services, on which defendants heavily rely, contradicts many of the plaintiffs' factual assertions.[14] In short, we are presented with two contrasting factual scenarios. On the one hand we have plaintiffs' Dickensian portrait of the New York foster care system as a social welfare bureaucracy which greedily grasps control over every child placed within its domain. Conversely, we have defendants' representation that the foster care system relies on extensive cooperation between parents and the state to create an environment most conducive to the child's care and rehabilitation. This disagreement as to the practices and character of the New York foster care system emphasizes the need for a more complete elaboration of the facts at trial. Accordingly, we reverse the district court's grant of summary judgment and remand for a trial on the question of whether New York's custody transfer requirement was applied in a manner that violates the Due Process Clause of the Fourteenth Amendment. The mandate shall issue forthwith.
 
 MANSFIELD, Circuit Judge (concurring):
 
 52
 I concur in the result reached by Judge Meskill's thorough and carefully considered opinion. However, I do not agree fully with some of its reasoning.
 
 
 53
 I do not subscribe to the majority's statement that a plaintiff may not use a "disparate impact" theory to establish a claim under § 504 of the Rehabilitation Act. In my view a plaintiff should be permitted to prove a violation of that Act by showing that a facially-neutral practice has a disparate impact on members of a protected class, just as a plaintiff may do to establish a violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 (1976 & Supp. V 1981), or of Title VII, 42 U.S.C. §§ 2000e-2000e17 (1976 & Supp. V 1981). The procedure is now well established as a method of enforcing anti-discrimination statutes. See Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); Griggs v. Duke Power Co., 401 U.S. 424, 429-30, 91 S.Ct. 849, 852-53, 28 L.Ed.2d 158 (1970); Geller v. Markham, 635 F.2d 1027, 1032 (2d Cir.1980), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). Nothing in the Rehabilitation Act distinguishes it in this respect from other antidiscrimination statutes. That Act's failure to mention the "adverse disparate impact" test, which is relied on by the majority, has no significance; no such mention is found in Title VII or the Age Discrimination in Employment Act.
 
 
 54
 Nor is there any support in the legislative history of § 504 for the conclusion that Congress intended to preclude a disparate impact theory. The legislative history of § 504 is sparse, New York Association for Retarded Children v. Carey, 612 F.2d 644, 649 n. 5 (2d Cir.1979). Yet in drafting the Rehabilitation Act in 1973 Congress was well aware of Griggs' disparate impact theory, and its silence on this subject must be construed as incorporation of the Griggs analysis. "As is apparent from its language, Section 504 is intended to be part of the general corpus of discrimination law." Carey, supra, 612 F.2d at 649. Since that "corpus of discrimination law" includes a disparate impact theory, such a theory is also presumptively available to plaintiffs under the Rehabilitation Act in the absence of a clear statutory mandate to the contrary.
 
 
 55
 Moreover, the Supreme Court implicitly recognized a disparate impact theory under § 504 in Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). There, after concluding that the refusal to admit the plaintiff who suffered from deafness into a nursing program did not violate § 504 because she was not an "otherwise qualified individual" who was denied admission "solely by reason of ... handicap," id. at 405-06, 99 S.Ct. at 2566, the Court inquired into whether the facially neutral requirement of hearing was an indispensible qualification. Thus it indicated that, if the requirement was not bona fide and had a disparate impact, the plaintiff might have made out a case under the Act. But since ability to hear was a valid requirement and the term "otherwise qualified handicapped individual" means a person qualified in spite of his handicap, which must be taken into consideration, she could not succeed. Id. at 406, 99 S.Ct. at 2367. See also Doe v. New York University, 666 F.2d 761 (2d Cir.1981).
 
 
 56
 None of the cases cited by the majority is to the contrary. Indeed the court in Pushkin v. Regents of the University of Colorado, 658 F.2d 1372, 1385 (10th Cir.1981), noted that
 
 
 57
 "[i]t would be a rare case indeed in which a hostile discriminatory purpose or subjective intent to discriminate solely on the basis of handicap could be shown. Discrimination on the basis of handicap usually results from more invidious causative elements and often occurs under the guise of extending a helping hand or a mistaken, restrictive belief as to the limitations of handicapped persons. A claim under § 504 would be analyzed more readily under a 'disparate impact' theory where it is claimed that a facially neutral practice has a discriminatory impact on persons within a protected class." Id. (citing Griggs v. Duke Power, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)) (emphasis added).
 
 
 58
 Lastly, as the majority concedes, a number of circuits have sanctioned use of the disparate impact analysis in cases under § 501 of the Rehabilitation Act. See, e.g., Prewitt v. United States Postal Service, 662 F.2d 292, 306-07 (5th Cir.1981).
 
 
 59
 I also have serious question about the majority's reliance, in its consideration of appellants' due process claims, on what it characterizes as the "voluntary" nature of the parents' decision to obtain state-subsidized residential care for their children. Although use of the state's temporary foster care system may in many instances be voluntary, in others it is not. As the Supreme Court pointed out with respect to New York's system in Smith v. Organization of Foster Families, 431 U.S. 816, 824-25, 97 S.Ct. 2094, 2099, 53 L.Ed.2d 14 (1977), "resort to such placements is almost compelled."Notwithstanding these differences, I concur in the result for the reason that the record demonstrates that, even if a case based on disparate impact were established, valid grounds exist for transfer of temporary foster custody.
 
 
 
 *
 Honorable Edward R. Neaher, United States District Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 The New York social service statutes do not define "special services." However, the New York social service regulations promulgated by the New York State Department of Social Services provide that:
 (c) Standard for placement. Placement of a child in foster care shall occur when removal from the home is essential for ensuring the child receives proper care, nurturance, or treatment. The circumstances in which placement may be considered essential for this purpose are the following:
 (1) Health and safety of child....
 ....
 (2) Parental refusal or surrender....
 ....
 (3) Parental unavailability....
 ....
 (4) Parent service needs....
 ....
 (5) Child service needs. (i) Circumstance. The child has special needs for supervision or services which cannot be adequately met by the child's parents or caretakers, even with the aid of intensive services in the home. This need for services is the result of one of the following:
 (a) The child has a diagnosed or diagnosable, physical, mental, or emotional condition which severely impairs the child's ability to carry out daily, age appropriate activities and which presents treatment needs which are too extensive or specialized for the child's parents to be able to maintain the child in the home.
 (b) The child's behavior, although not dangerous, cannot be managed in the home, the school, or the community, even with extensive support to the parents and child.
 (c) The child's behavior presents a serious danger to other people or to the child himself.
 N.Y.Admin.Code tit. 18, § 430.10(c) (1982).
 
 
 [2]
 When plaintiffs originally instituted this declaratory judgment action, they alleged only that N.Y.Soc.Serv.Law § 358-a abridged their rights. However, during the course of the litigation the parties agreed to increase the number of allegedly unlawful statutes to include "Social Services Law §§ 358-a, 384-a and rules, regulations and administrative directive pursuant thereto." Stipulation, J.App. at 118. The district court recognized that the
 challenged sections of New York Social Services Law have also been amended several times since this action was commenced. It is not disputed that the amendments tend to increase the protection afforded plaintiffs. Several of the amendments have been cited and discussed by the parties in their supplemental briefs. Since this is an action for declaratory not monetary relief, and since the parties have apparently recognized and conceded the applicability of the amendments, the court shall consider the statute [and regulations] as amended, and all citations are to the statute [and regulations] as most recently amended.
 
 
 [533]
 F.Supp. 233 at 235 n. 3. We agree
 
 
 [3]
 The district court also concluded that the transfer of custody requirement did not violate the Social Security Act. 533 F.Supp. at 237-38
 When plaintiffs initiated this declaratory judgment action, in addition to their Social Security Act, Rehabilitation Act and Due Process Clause claims, they argued that the custody transfer requirement violated the First, Ninth and Fourteenth (Equal Protection Clause) Amendments to the United States Constitution. They subsequently moved for summary judgment on all but one of their claims, including these constitutionally-based allegations. In granting plaintiffs' partial summary judgment motion, the district court made no mention of any constitutional claim other than substantive due process.
 Ordinarily the court's grant of partial summary judgment is a nonappealable interlocutory order. McNellis v. Merchants National Bank & Trust Co., 385 F.2d 916, 918 (2d Cir.1967). However, the district court dismissed the First, Ninth and Fourteenth Amendment claims without prejudice and, pursuant to Fed.R.Civ.P. 54(b), expressly directed that in the interest of judicial economy, final judgment should be entered on all of those issues adjudicated in its February 10, 1982 order and opinion and order of June 17, 1982. Joyner v. Dumpson, 75 Civ. 35 (S.D.N.Y. Aug. 6, 1982). In so doing, the district court converted a nonappealable interlocutory order into an appealable final judgment. Cf. Acha v. Beame, 570 F.2d 57, 61-62 (2d Cir.1978); Cinerama Inc. v. Sweet Music, S.A., 482 F.2d 66, 69 (2d Cir.1973). Thus, the only issues litigated in this appeal are the alleged violations of the Rehabilitation Act and the Due Process Clause.
 After the district court's grant of summary judgment, the parties engaged in several months of discussions designed to implement the decision. Subsequently, defendants filed a motion pursuant to Fed.R.Civ.P. 60(b)(5) for relief from judgment based on the claim that proposed administrative changes in the VPA would satisfy the court's summary judgment ruling. The court denied this motion and also denied defendants' Fed.R.Civ.P. 62(d) motion for a stay pending appeal. Joyner v. Dumpson, 75 Civ. 35 (S.D.N.Y. June 17, 1982). Our disposition of the summary judgment issue obviates the need to consider these rulings.
 
 
 [4]
 The term "handicapped individual" is defined as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706-(7)(B) (Supp. V 1981); 45 C.F.R. § 84.3(j) (1977)
 
 
 [5]
 Section 504 was originally silent on the subject of compliance regulations. The Senate Public Welfare Committee subsequently explained that although the statute did "not specifically require the issuance of regulations or expressly provide for an enforcement procedure ... such regulations and enforcement [were] intended." S.Rep. No. 1297, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.Code Cong. & Ad.News 6373, 6390. See Cherry v. Mathews, 419 F.Supp. 922 (D.D.C.1976) (district court held that Congress had intended regulations to be issued and ordered the Department of Health, Education and Welfare to do so). In April 1976 an Executive Order directed the Department of Health, Education and Welfare to issue compliance rules. Regulations were promulgated pursuant to this order. See 34 C.F.R. § 104 et seq. (1982); 45 C.F.R. § 84 et seq. (1982)
 
 
 [6]
 In Judge Gagliardi's first opinion denying plaintiffs' motion to amend their complaint to add the Rehabilitation Act claim, a ruling which he subsequently reconsidered and reversed, the court revealed its misunderstanding of the elements comprising a Rehabilitation Act claim:
 Plaintiffs have argued persuasively that they and members of their class have stated a cause of action under Section 504 because (1) they come within the definition of "handicapped individuals" as defined in the regulations, ... and because (2) they are being discriminated against by a "health, welfare, [or] other social service program in a manner that limits or has the effect of limiting the participation of qualified handicapped persons ...." 45 C.F.R. § 84.52(4) (1977).
 Joyner v. Dumpson, 75 Civ. 35, slip op. 1, 4 (S.D.N.Y. Sept. 30, 1978) (footnotes omitted) (citations omitted) (emphasis added).
 
 
 [7]
 We are not saying that the "disparate impact" theory of Rehabilitation Act violations is invalid for all suits alleging discrimination based on handicap. An increasing number of courts have concluded that under section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, as amended by the Comprehensive Rehabilitation Service Amendments of 1978, 29 U.S.C. § 794a (1978 & Supp. V 1981), plaintiffs may rely on such a theory of recovery to combat handicap discrimination by the federal government in the employment context. See Prewitt v. United States Postal Service, 662 F.2d 292, 306-07 (5th Cir.1981); Bey v. Bolger, 540 F.Supp. 910, 927 (E.D.Pa.1982). We have not yet considered this question and need not do so here
 
 
 [8]
 Nowhere on the face of either section 358-a or 384-a is it stated that children will be denied admission into state subsidized residential centers unless their parents relinquish custody to the state. However, defendants have conceded that these social services statutes embody the custody transfer requirement. See 533 F.Supp. at 236 n. 5
 
 
 [9]
 Although the district court recognized that its disposition of the Rehabilitation Act obviated the need to consider the constitutional issue, the court presented its substantive due process analysis as an alternative ground for the decision. 533 F.Supp. at 239 n. 9
 
 
 [10]
 Q: Once the child's parents have signed the transfer instrument, may the child or the parent terminate the service without the consent of the Commissioner?
 A: No.
 Q: Is this fact explained to the parent prior to signing?
 A: Well, this fact is, in effect, stated in the form itself and I presume the form is gone over with the client.
 "I understand that when the reason for placement no longer exists I should ask for the child's return and the Commissioner will return the child, provided that the Commissioner is satisfied that I [am] able to care for the child."
 Deposition of Carol Parry at 19-20.
 
 
 [11]
 Q: Is it the policy of BCW [Bureau of Child Welfare] to permit parents to delete any words or phrases from the instrument to which the parents raise objections?
 A: It is the policy only to have specific things deleted.... certain words which are in the singular which should be in the plural, like "I" or "we," and inappropriate words such as "father," "mother," "guardian" can be crossed out and the appropriate word can be put in.
 Deposition of Carol Parry at 15.
 Ruth Rogers, mother of named plaintiff Jay Joyner, stated in her affidavit:
 
 
 [11]
 I told Mr. Erhardt that I did not like the form, and that he should come back after I had thought about it and talked to a lawyer. I told him I might want to add a stipulation or an addendum to the form. Mr. Erhardt seemed reluctant to leave, and I felt pressure from him to sign it right away
 
 
 [12]
 Mr. Erhardt then called me on December 20, December 23, and December 27. Each time I told him that I was not a neglectful mother and did not want to waive either my own rights or those of my child, as the form seemed to require
 
 
 [13]
 Mr. Erhardt told me that if I signed the form I could still take Jay home any time I wanted to. I didn't think that is what the form said, and when I asked Mr. Erhardt to write that on the form he refused
 J. App. at 87 (emphasis added).
 
 
 [12]
 Ruth Rogers testified:
 
 
 [17]
 Once custody is transferred, the Commissioner can place Jay wherever he chooses, no matter what either Jay or I desire. I do not wish to sign any form which has this result. It is important to both Jay and myself that critical choices about his future be made by the two of us, and not by a public official. I want to know that if Jay doesn't like Pleasantville and we decide between us that he would receive better care somewhere else, I can place him in a more suitable program without first having to seek government approval. Neither of us wants some agency to have total control over Jay's life. As a parent, I simply cannot and will not delegate responsibility for bringing up my son to total strangers
 J. App. at 88.
 p 9 from the 9(g) Statement of Facts:
 
 
 [9]
 Once plaintiffs' custody is transferred to the local social services commissioner, the type of treatment services plaintiffs will receive is within the commissioner's discretion. Neither plaintiffs nor their parents may cause or prevent a transfer from one agency or program to another if the commissioner does not agree. Similarly, matters such as visitation at home or in placement and medical care are within the local commissioner's discretion. If there is disagreement between plaintiffs' parents and the commissioner on these matters, the commissioner prevails
 J. App. at 80-81.
 
 
 [13]
 Q: If the agency or the Commissioner make a determination that visits of the parent to the child shall be limited or shall occur once a month, or once a week, that determination cannot--the parent is not permitted to visit more than the stated time?
 A: That's correct.
 Deposition of Carol Parry at 21.
 
 
 [14]
 Q: If a definite period of time is indicated on a form, on this form, is the consent of the local social service commissioner required before a child may be returned to his parent?
 A: No.
 Deposition of Robert Page at 34.
 Q: Once the form has been signed and again I am talking about surrender of child for temporary care which is the form used by your testimony outside of New York City, may the parent or the child prevent a transfer of the child from one agency or program to another without the agreement of the commissioner?
 A: No. The determination of the program or agency that the child will be assigned to is a joint determination based on a plan worked out between the Commissioner of Social Services and the parent, with the Commissioner of Social Services having the final decision.
 Deposition of Robert Page at 36.
 Q: Once the form is signed may the parent or the child determine without consent of the local social services commissioner when and how often the parent may visit the child?
 A: Well, the state policy in relation to that would be to encourage visiting whenever it was to the interest of the child which in a typical case would be frequently, as frequent as possible.... There would be of course in an individual case, it would depend on the treatment plan that was under way in relation to the child.
 Deposition of Robert Page at 37.