■ In the Matter of SHEILA G. — In a proceeding pursuant to section 384-b of the Social Services Law to terminate the parental rights of the natural parents of a child, upon the ground that said child is permanently neglected in which the natural father cross-moved for permanent custody of the child, the intervenor foster parents appeal (1) as limited by their brief, from so much of an order of the Family Court, Kings County (Torres, J.), dated March 11, 1982, as, in effect, dismissed the petition as to the natural father, directed the Commissioner of the Department of Social Services of the City of New York to formulate a plan to transfer custody of the child to the natural father as soon as is feasible, and granted the commissioner the discretion to allow the father visitation with the child, (2) from so much of an order of the same court dated August 25, 1982, as promulgated a plan for the transfer of custody of the child, and (3) from so much of a further order of the same court dated February 3, 1983, as denied their motion to vacate the prior orders dated March 11, 1982 and August 25, 1982, and reopen the hearings, on the ground of newly discovered evidence. Orders dated March 11, 1982 and August 25, 1982 reversed insofar as appealed from, on the law and the facts, by vacating the provisions finding that the natural father was not permanently neglectful, directing the city commissioner of social services to formulate a plan for transferring custody of the child to the natural father, adopting the commissioner's plan of transfer of custody, and granting the commissioner the discretion to allow the natural father visitation with said child and substituting therefor provisions adjudicating the child to be permanently neglected by both natural parents, denying the natural father's cross application for custody of the child and denying him any visitation. The child shall remain with the appellants under the supervision of the Sheltering Arms Childrens Service, without prejudice to the rights of the appellants to apply for the adoption of said child. Appeal from the order dated February 3, 1983 dismissed as academic in light of our determination on the appeals from the orders dated March 11, 1982 and August 25, 1982. No costs or disbursements are awarded. In the record before us, we find clear and convincing proof that Sheila G. is a permanently neglected child as defined in subdivision 7 of section 384-b of the Social Services Law. On August 28, 1977 Sheila was born with heroin withdrawal symptoms. Her father was not named on the birth certificate. After she was treated in the hospital for approximately one month Sheila was placed in the care of the Brookwood Child Care Agency on the consent of her unwed mother. Sheila lived with one foster family for approximately one year and was then moved to her current foster home where she is currently living with the appellants. There is little question that the serious trauma of experiencing heroin withdrawal at birth, as well as being separated from her first set of foster parents during a critical formative period in the child's development, has had a profound impact on her psychological development. There is overwhelming evidence in the record indicating that the threat of her now being separated from the appellants, which threat the child is obviously aware of, is having a devastating effect on her. The natural father's claim that custody should be transferred to him immediately is an indication that he cannot comprehend the strong psychological ties that the child has formed with her present foster parents, nor can he appreciate her emotional needs, which is, in itself, evidence of permanent neglect as defined by the statute (see *Matter of Roxann Joyce M.*, 75 AD2d 872, 873). In November, 1977 the natural father learned of Sheila's placement with the Brookwood Child Care Agency. He called the agency and told a caseworker that he was interested in providing support, but he made it clear that he was unable to assume custody of his daughter at that time. On November 21, 1977 the father met with a caseworker regarding visitation. He was told that the agency would not accept his

offer of support or allow visitation until he established his paternity in court, because the mother opposed such visitation. He was instructed to file a petition in Family Court to establish his paternity. Although he was repeatedly advised by the agency to do so promptly, and was employed full time by the United States Postal Service in 1977, the father delayed in commencing his paternity proceeding until May, 1979, and was not successfully adjudicated as the father until July 18, 1979. When he first met with the caseworker, the father was living in a single room at the YMCA. It is clear that he was experiencing serious problems with alcohol and drug abuse. The father never told anyone at the agency about his drug abuse problems, and at the permanent neglect hearings he lied with regard to the persistence of his drug addiction. Meanwhile, in September, 1978 the agency decided to place Sheila in a pre-adoptive home with her present foster parents. Sheila had been in foster care for one year. It was clear that the agency's efforts to help the natural mother plan for the child's care were futile. She was uninterested and without means to assume custody. The natural father expressed an interest in Sheila's welfare but his contacts amounted to telephone inquiries and nothing more. He had not made any progress in establishing his paternity, nor had he indicated that he was interested in assuming responsibility for the child's care. However, in November, 1978, the mother changed her position and agreed to allow visitation. The agency set up a regular schedule of biweekly visits, but visitation proved highly stressful for Sheila. The child suffers from a number of adverse symptoms such as sleeplessness, nightmares, eating disorders and aggressive behavior, all of which become pronounced after visits with her natural father and other members of his family. In January, 1979 the father indicated for the first time that he was interested in assuming Sheila's custody. Regular visitation continued until shortly after the adjudication of paternity when visitation became more sporadic. Apparently, the father was suffering adverse consequences from alcohol abuse. In January, 1980, the father was hospitalized for alcohol detoxification. In May, 1980, the Brookwood Child Care Agency instituted the instant proceeding in the Family Court to have Sheila declared a permanently neglected child, and to terminate the parental rights of both her natural parents. On or about July 30, 1980, the father served a cross petition for permanent custody. Several months before the permanent neglect petition was served, the father moved into a two-bedroom New York City Housing Authority project apartment, which he shared with his mother and adult sister. His proposed plan for Sheila's care was to have either his sister, who was unemployed, or his mother who worked evenings, provide supervision when he wasn't home. From our reading of the record, it is apparent that the paternal grandmother was the driving force behind her son's interest in gaining custody of the child. With regard to the grandmother's role in the child's care, we note that she has expressed a certain detachment about her own children, some of whom have serious behavior problems. She seemed almost apathetic and unaware of her son's alcohol and drug abuse problems. There is little evidence in the record regarding the sister's qualifications to provide care for the child. At the permanent neglect hearings, the Family Court received compelling testimony from numerous expert witnesses in the field of child psychology. All the experts agreed that Sheila has formed an unusually strong attachment for her present foster parents, and suffers extreme anxiety whenever she visits her natural father. They expressed the fear that separation from the foster parents could cause permanent damage to Sheila's personality and emotional development. In fact, when the court promulgated its plan for the transfer of custody, in its order dated August 25, 1982, it virtually disregarded an updated report on the child's psychological condition, indicating that she still suffers extreme anxi-

ety because of the visitation with her natural father. There was also evidence of the father's prolonged history of alcohol and drug abuse. The father admitted using heroin for at least six years. He displayed his track marks to the court and conceded that his drug use had once been pretty active. In fact, the record indicates that the father continued to use heroin until as late as August 24, 1982, when he was admitted to a methadone maintenance program. This evidence directly contradicts the father's claim at the hearings that he has been drug free since March, 1981. In its order dated March 11, 1982 the Family Court concluded that the petition to terminate the mother's parental rights should be granted, but dismissed the petition as to the father. The court was impressed by the extraordinary circumstances that exist, holding that the evidence of Sheila's extreme "separation anxiety" warranted a disposition in the best interests of the child (see *Matter of Bennett v Jeffreys,* 40 NY2d 543). However, the court blamed the Brookwood Child Care Agency for the unfortunate circumstances that exist, finding that the agency's actions constituted a deviation from its statutorily imposed obligation to work towards reunification of the natural family. Accordingly, the court concluded that custody must be transferred to the natural father, but the court directed the City Commissioner of Social Services to formulate a plan which would effectuate the transfer without causing harm to the child. We disagree with the Family Court's conclusion that the Brookwood Child Care Agency is to blame for the unfortunate and extraordinary circumstances that exist in the instant case. Although the permanent neglect statute reflects a cultural judgment that society should not terminate the parent-child relationship unless it has first attempted to strengthen it (*Matter of Leon RR.,* 48 NY2d 117, 126), the statute also expresses the Legislature's intent to further the best interests, needs and rights of the child by terminating parental rights and freeing the child for adoption where positive, nurturing parent-child relationships no longer exist (see Social Services Law, § 384-b, subd 1, par [b]). Before a parent can be found permanently neglectful, the agency bringing a petition to terminate his parental rights must establish that it has made diligent efforts to encourage and strengthen the parental relationship, but only when such efforts will not be detrimental to the best interests of the child (see Social Services Law, § 384-b, subd 7, par [a]; see, also, Family Ct Act, § 611). This is not a case where the agency blocked or interfered with the return of the child to the natural parent as occurred in *Matter of Sanjivini K.* (47 NY2d 374) or in *Matter of Leon RR.* (*supra*). In the instant case, the agency did not place the child in her present pre-adoptive home until after she had been in the custody of the agency for more than one year. The agency's responsibility should not be considered, *in vacuo,* without considering the parent's primary responsibility to assume his own obligations when he is financially and physically able to do so (cf. *Matter of Ikem B.,* 73 AD2d 359). It is clear that the father had an adequate income to provide for the child's care from the first day he learned of her placement at Brookwood Child Care Agency. However, he expressly stated that he was unable to undertake that responsibility. In fact he did not present any feasible plan or even express an interest in assuming the child's care for well over one year after he first contacted the agency. Moreover, Sheila was almost two years old before the father established his paternity, and he never contributed to her support, even though he was allowed visitation since November, 1978. Although possessed of sufficient financial means, the father failed to take positive steps to put himself in a position to meet his parental obligations. The fact that he showed an interest in Sheila's welfare does not excuse his failure to take action within his control, namely, to show that his interest was bona fide by moving promptly to establish a feasible plan for the child's care (see *Matter*

*of Diana S.,* 68 AD2d 915; *Matter of Orlando F.,* 40 NY2d 103). We also note our disagreement with the Family Court's conclusion that despite his long history of alcohol and drug abuse, there is no indication that the father's ability to function as a parent is impaired. To the contrary, it is apparent that the father's addiction to one type of drug or another has persisted since before Sheila was born. He has lied to the court about the scope of his addiction in an obvious attempt to hide the fact that he has been unable to cope with his own problems relating to his continued drug abuse. To date, he has participated in a number of rehabilitation programs without success. In our view, the natural father's continued problems coping with drug abuse is additional evidence that he is unable to exercise even a minimum degree of care for the child's welfare (cf. Family Ct Act, § 1012, subd [f]). Titone, J. P., Lazer, Weinstein and Rubin, JJ., concur.