*424 OPINION OF THE COURT
Mary Ellen Fitzmaurice, J.
In this custody petition, filed on March 10, 1994, the court is asked to weigh the relative rights of a 17-year-old natural mother who recognizes that she cannot emotionally care for her child, and wishes to sever all ties with the child by placing the child for adoption, against those of a 19-year-old natural father, who has substantially cared for the child since the child’s birth and wishes to keep the child and raise him with the help of the paternal grandmother.
The paternal grandmother appeared on March 10, 1994 and apprised the court that the child had been given by the natural mother to a couple, through Catholic Charities, for adoption. At that time the paternal grandmother did not know the whereabouts of the child. The court amended the petition and issued process to respondent mother, respondent father, and Catholic Charities. The court also ordered an investigation and report by the Probation Department.
On March 22, 1994, the paternal grandmother, without counsel, filed a judicial application requesting temporary custody of the child.
The court determined, insofar as paternal grandmother had the child, it was in the best interest of the child to give the paternal grandmother a temporary order of custody so that she could obtain medical insurance for the child. The court also ordered an investigation by the Child Welfare Administration, in order to determine whether the natural mother had surrendered the child.
On April 27, 1994, the parties appeared with counsel. The Legal Aid Society was appointed as Law Guardian for the child. Catholic Charities was stricken from the petition, as respondent, when it was determined that they had merely counseled the mother on her decision to place the child for adoption and had played no role as intervenor. Inquiry was made as to whether the mother had signed a consent to have the child adopted and mother denied having done so. The mother also denied surrendering the child. On June 6, 1994, the mother cross-moved resisting the custody petition and requesting that custody be granted to her for the sole purpose of surrendering the infant for adoption. On July 19, 1994, the court, finding a rare extraordinary circumstance as envisioned by Matter of Bennett v Jeffries (40 NY2d 543), found that the matter must be controlled by the best interest of the child.
*425 The matter was set down for trial and hearings were held on August 2, 1994, August 23, 1994 and October 25, 1994. Paternal grandmother and natural father were represented by the same attorney after the court determined that their interests were joined. The mother was represented by counsel and her mother was in the courtroom throughout these proceedings. The child was represented by a Law Guardian.
During the hearing of the matter, four witnesses testified: the natural father, paternal grandmother, natural mother, and maternal grandmother. The following are the court’s findings of facts and conclusions of law in the matter.
FINDINGS OF FACTS
Natural mother, Alexandra K., began dating Carlos P., the child’s father, around March of 1992 when she was 15 years old and he was 17 years old. In June of 1993, they began engaging in sexual relations. Carlos and Alexandra failed to take any precautions, and in early August of 1993, they learned that Alexandra was seven weeks pregnant. Immediately after receiving the pregnancy test results, the parties discussed the future of the child. During the first discussion, Carlos expressed his opposition to the idea of adoption. About two weeks later, the two spoke about the issue again. Nothing was resolved. The testimony concerning this second discussion is in dispute. Alexandra claims that Carlos told her that if she had the child he would want nothing to do with her and in fact insisted that she have an abortion. Carlos emphatically denies telling Alexandra to have an abortion. The court finds mother’s testimony on this matter wholly self-serving and fabricated solely in her belief that it would somehow bolster her request for this court to terminate the father’s parental rights.
Assuming, arguendo, that the father had suggested that the mother have an abortion, this court draws no negative inference from such a suggestion because abortion is one of the legal alternatives available to a couple who does not wish to have a child. The consideration of this alternative has no further implications as to the intentions or actions of either parent, and has no effect on custody proceedings once the child is born.
Shortly after the second discussion, the parties stopped dating. The natural mother told her mother that she was pregnant. The maternal grandmother reportedly responded by *426 advising her daughter not to have an abortion, and by taking her daughter to counseling.
In late February, the mother decided to place the child for adoption. In accordance with this decision, and without consulting with the father, the mother attempted to arrange an adoption before the child was born, but claims she was unable to do so.
On March 3, 1994, the child, Chris, was born. While at the hospital, Dr. Rodriguez informed Alexandra that he knew of a couple desirous of adopting a baby and gave Alexandra the couple’s phone number. Alexandra contacted the couple, even though she knew the father was not in agreement and would never consent to the adoption. The couple came to the hospital and spent several hours with Alexandra and her mother and the baby. On March 5, 1994, the proposed adoptive parents took the baby from the hospital to their home at an undisclosed location. It remains unclear to this court how the adoptive parents were able to remove the child from the hospital without written consent from the natural mother, as no satisfactory explanation for this occurrence has been provided to the court. The adoptive parents were aware of the pending paternity hearing and kept in touch with Alexandra awaiting the outcome of the hearing.
The child was due between March 15 and March 25, 1994 and on December 13, 1993, Carlos filed a paternity petition in Queens Family Court. The court takes judicial notice of docket No. P11153/93 in which an order of filiation was entered on consent of the parties on March 10, 1994. It was during this proceeding that Carlos learned for the first time that the child had been born.
Carlos immediately expressed an interest in taking custody of the child and once again stated his disapproval of the idea of adoption. It is not clear from the record how this was conveyed to the adoptive parents, but by March 15, 1994, the adoptive parents wanted to return the child.
The paternal grandmother, in response to a person called "Nina”, contacted the prospective adoptive parents at an "800” number, and arranged to meet them at a diner. Carlos accompanied his mother to the meeting, and took his son home. The child has resided with his father since that time. However, Carlos is currently in the Marine Corps Reserves, and is required to be absent from his home for nine months, from September 1994 through April 1995. Carlos wants his *427 mother to receive an order of custody during the time that he is away, since his mother will physically have the child. Paternal grandmother works full time and plans to leave the child during work hours with a neighbor, Ms. Moon, who is a friend of the family as well as a day-care provider. The father plans to resume the parenting responsibilities of his child when he returns, and further plans to enroll in college.
By supporting paternal grandmother’s petition for custody, the father will be able to spend a short time in the service and obtain some skills and benefits which will enable him to better provide for his child. This is viewed by both Carlos and his mother as a temporary arrangement because ultimately Carlos plans to resume caring for his child, as he has done from March 15, 1994 until his departure to the Marines in September 1994.
The natural mother to this date maintains that she is unable to care for the child, and would rather see "it” adopted than raised by his natural father. Indeed, natural mother’s cross petition requests that this court terminate the father’s rights in her belief that her right to give up her child is superior to the legal biological father’s right in the child. No adoptive parents have ever filed a petition requesting to adopt Chris. The natural mother does not have particular adoptive parents in mind. Armed with a singular belief that adoption by a two-parent family is the only way to bring up a child, as well as the desire of avoiding any financial obligation to the child, the natural mother has come to court opposing petitioner’s request for custody and further asking that his rights be terminated.
On the other hand, Carlos has demonstrated a strong and substantial interest in his child. During Alexandra’s pregnancy, he attempted to contact her, and offered her money. In September 1993, he gave her $40 for vitamins, and in February 1994, offered her $200, which she refused. Carlos filed a paternity petition in Family Court, and at this proceeding expressed his interest in obtaining custody of the child. When he learned that Alexandra had given birth, and had allowed a couple, who were strangers to the child and to her, to take the child home, Carlos immediately embarked on a diligent search to discover the whereabouts of his child. After securing physical custody, Carlos met with a counselor at the Queens Guidance Center to learn "how to be a better parent”. He plans to remain in contact with the counselor, who will make home *428 visits periodically, and to pursue this service as one avenue toward learning all he needs to know about raising his child.
The Legal Aid Society, who served as the child’s Law Guardian, employed the services of a social worker to monitor the care the child was receiving during these proceedings. It was the recommendation of the Law Guardian that custody of the child be given to the paternal grandmother and the natural father.
CONCLUSIONS OF LAW
Pursuant to Social Services Law § 384-b, Family Court is empowered to hear proceedings for termination of parental rights. Commencement of these proceedings may be originated by: (1) an authorized agency; or (2) foster parent authorized under Social Services Law § 392 or Family Court Act § 1055; (3) a Law Guardian where an authorized agency was ordered by the court to originate a proceeding and failed to do so within the time specified by the court (Social Services Law § 384-b [3] [b]).
The statute does not provide for a natural mother to petition the court for the rights of the natural father to be terminated in order for the child to be freed for adoption.
It is clear that the intent of the Legislature in enacting Social Services Law § 384-b was to assure protection of the rights of the natural parent, where a positive and nurturing parent-child relationship exists, and terminating parental rights and freeing the child for adoption to further the child’s best interest, needs and rights, where a parent-child relationship did not exist (Matter of Sheila G., 94 AD2d 731).
Even if the statute permitted the natural mother to commence a termination proceeding, her desire to get a fresh start in life without the burden of having the child reared in her neighborhood, or the possibility of being sued for child support, would not make out a prima facie case for termination (see, Matter of Star Leslie W., 63 NY2d 136; Matter of Julius P., 100 AD2d 741).
Another way the rights of a parent may be terminated would be within the context of an adoption proceeding under Domestic Relations Law § 111. Since no adoption petition has ever been filed, the court need not give this any further consideration. It is understandable, and to their credit, that the purported adoptive parents returned the child, and did not wish to become embroiled in a contested adoption where the *429 natural father had done everything in his power to assert his interest in the child and has, in this way, ostensibly satisfied the elements set forth in Domestic Relations Law § 111 (1) (e).
Termination proceedings cannot be used to: ensure that a child be raised in a two-parent home; avoid financial responsibility for the child; or to further the "myth of maternity” (i.e., mother knows best). Therefore, Alexandra sets out no legally valid theory that would support the termination of the father’s rights.
In this custody proceeding, the wishes and desires of the mother, based on traditional and arguably inaccurate notions of "family”, and on her self-serving desire to be relieved of any financial responsibility, are not controlling, nor are they even factors to be considered by the court. What the mother believes to be in her own best interest is not the concern of this court. Rather, the well-established standard to be applied in the determination of custody is the best interest of the child (Matter of Corradino v Corradino, 64 AD2d 320, affd 48 NY2d 894; Friederwitzer v Friederwitzer, 55 NY2d 89). The application of this standard necessarily requires the court to take many factors into consideration, including but not limited to the importance of stability in the child’s life.
In this case, the child has lived with the natural father since the child was 12 days old. The father, with the help of the paternal grandmother, has been the caretaker of the child. The evidence produced in court, through the testimony of the parties, supports the contention that Carlos is a loving and caring father who has gone to great lengths to plan for the future of the child with the help, love and support of his mother.
Carlos has made arrangements for his son to be well cared for in his absence. He has made specific and responsible plans for the future, as evinced by the testimony, in the happy expectation of providing a stable home for his son, and with the understanding that by continuously improving his own situation, he vicariously improves that of his child.
The alternative to granting the custody petition, that supported by the natural mother, is absolutely inconceivable to this court. Alexandra would have the child turned over to her only to place him in foster care. Alexandra has taken no affirmative steps to plan for the future of the child, in fact she does not want custody. Alexandra urges this court to consider adoption to be in the best interest of the child, and to free him *430 to her for this purpose. This notion is simply unacceptable because no other person has come forth to claim an interest in the child, but more importantly because the child’s father and paternal grandmother are seeking custody.
Even had an adoption petition been filed, it would not determine the outcome of this case because the natural father has demonstrated a substantial interest in the child, has formed a relationship with him, and all factors having been taken into consideration, his rights in the child far outweigh those of any stranger. Alexandra has no standing to move for the termination of Carlos’ parental rights, and furthermore has no valid legal arguments to support the idea of such termination. In sum, Alexandra does not here seek custody of the child, but only wishes to prevent the natural father from obtaining custody (see, Matter of Stephen C., 170 AD2d 1035; Lehr v Robertson, 463 US 248). In blatant contrast, Carlos seeks custody of the child, and has satisfied this court that he is sincerely committed to the well-being of his son.
In cases where parties behave in a mature and amicable fashion, joint custody is deemed appropriate (Matter of Sooy v Sooy, 101 AD2d 287, affd sub nom. Matter of Louise E. S. v Stephen S., 64 NY2d 946). Here, both Carlos and paternal grandmother have joined interests to provide a stable consistent environment for Chris. It is important that both Carlos and paternal grandmother continue to have meaningful and frequent access to the child so that the stability may continue.
The law assumes visitation to be in the child’s best interests, absent proof to the contrary (Matter of Wise v Del Toro, 122 AD2d 714). Alexandra, however, has not requested visitation nor has she expressed an intention to see the child. Rather, she testified in court that she was unsure whether she wished to see the child at all. Therefore, the issue of visitation cannot be addressed by the court until Alexandra expresses an interest in the child.
Based on the foregoing and the totality of the circumstances, the court finds that it is in the best interest of the child that petitioner’s request be granted and the custody of the child, Chris, be awarded jointly to the father, Carlos P., and the paternal grandmother, Aida G. Hence it is hereby ordered: Final order of joint custody of the child Chris P. (born March 3, 1994) to Carlos P. and Aida G. Mr. P. to have *431 physical custody of child when Mr. P. is out of the Reserves. Mrs. G. shall have physical custody when Mr. P. is away in the Reserves. This is without prejudice to respondent mother’s right to petition the court for visitation; and to father petitioning court for child support.