Brandon COLLINS, by his mother and next friend Barbara COLLINS, Omega McCullagh, by his mother and next friend, Gabby Miles, Barbara Collins, and Gabby Miles, on their own behalf and on behalf of those similarly situated, Plaintiffs,

v.

John HAMILTON, in his official capacity as Secretary of the Indiana Family and Social Services Administration, Melanie Bella, in her official capacity as Assistant Secretary of the Office of Medicaid Policy and Planning, and Janet Corson, in her official capacity as Director of the Division of Mental Health, Defendants.

IP 01–0244–C–Y/K.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 30, 2002.

Jacquelyn B. Suess, Indiana Civil Liberties Union, Indianapolis, IN, for Plaintiffs.

Terry G. Duga, Deputy Attorney General, Indianapolis, IN, for Defendants.

## ENTRY ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

YOUNG, District Judge.

On April 20, 2001, Plaintiffs filed a class action complaint for injunctive and declaratory relief on behalf of themselves and others similarly situated. In their complaint, Plaintiffs allege that the Defendants[1] violate federal Medicaid law by failing to provide medically necessary residential psychiatric treatment for Medicaid-eligible children. Plaintiffs also allege

---

1. Defendants include John Hamilton, in his official capacity as Secretary of the Indiana Family and Social Services Administration; Melanie Bella, in her official capacity as Assistant Secretary of the Office of Medicaid Policy and Planning; and Janet Corson, in her official capacity as Director of the Division of Mental Health. They are referred to herein as "Defendants" or "the State."

that Defendants violate Plaintiffs' substantive due process rights by requiring parents to agree to wardship of their children in order to obtain the funds necessary for residential psychiatric treatment. This action is brought under 42 U.S.C. § 1983 ("Section 1983").

Before the court are two motions: Plaintiffs' Motion for Summary Judgment and Defendants' Motion for Summary Judgment. For the reasons set forth below, the court **GRANTS** in part, and **DENIES** in part, Plaintiff's Motion for Summary Judgment, and **GRANTS** in part, and **DENIES** in part, Defendants' Motion for Summary Judgment.

## I. Jurisdiction

The court has original jurisdiction over this cause pursuant to 28 U.S.C. § 1331.

## II. Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The facts in this case are undisputed. Accordingly, this case is particularly appropriate for summary disposition.

## III. Facts

1. Indiana participates in the federal Medicaid program and is bound by all of its requirements. Ind.Code 12–15–1–1, *et. seq.*

2. The State of Indiana has an Early and Periodic Screening, Diagnosis and Treatment Program ("EPSDT"), which it calls Health Watch. 404 IAC 501501, *et seq.;* March 15, 2001 Deposition of Tracy Brunner ("Brunner Dep. I") at 7, 13).

3. Indiana's EPSDT Medicaid program must pay for all corrective treatment that is found to be necessary in an EPSDT screening and that is a covered service under federal Medicaid law, even if such service is not normally covered under the State's Medicaid program. 405 IAC 5–15–4; Brunner Dep. I at 35, 47, 48, 50–51, 53).

4. EPSDT screenings are examinations conducted by each child recipient's primary medical provider. (Brunner Dep. I at 34–35).

5. Indiana provides mental health services through inpatient facilities, outpatient services, and residential facilities. (Deposition of Richard Deliberty ("Deliberty Dep.") at 16; Deposition of Carol Gable ("Gable Dep.") at 6).

6. For both inpatient and residential care, the patient lives in the facility and gets counseling, treatment, medication and other mental health services in the facility. (Gable Dep. at 8).

7. The difference between inpatient care and residential care is that inpatient care is acute care, which is shorter term, and residential care is chronic care, which is long-term care. (Gable Dep. at 6–8).

8. Although Indiana Medicaid will pay for acute care services, hospital services, and covered inpatient and outpatient mental health services, it will not pay for the cost of medically necessary residential placement for children. (Deliberty Dep. at 17–18, 24, 29; Gable Dep. at 14–16, 21; Gable Dep. Ex. C; Answers to Interrogatories, ¶ 7; Affidavit of Che-

ryl Rietman ("Rietman Aff."), ¶¶ 8, 10).

9. In other words, Indiana Medicaid will pay for room and board costs for children getting mental health treatment in a hospital, but will not pay for room and board costs for children getting mental health treatment in a residential facility. (Gable Dep. at 17; Affidavit of Carol Gable ("Gable Aff", ¶ 5)).

10. The Indiana Medicaid program does not acknowledge the category of "residential psychiatric facility" and will not provide Medicaid coverage for such a facility. (Gable Dep. at 9).

11. There are residential psychiatric treatment facilities in Indiana[2] that provide active treatment to children according to the dictates of a treatment team and under the direction of a psychiatrist, and that are licensed by the Joint Commission on Accreditation of Healthcare Organizations. (Lysinger Aff., ¶¶ 3–5, 7; Deliberty Dep. at 22).

12. Prior to the filing of this lawsuit, county offices of family and children filed Child In Need of Services ("CHINS") petitions for the purpose of providing necessary mental health services for children who could not get the services paid for by Medicaid or in any other way. (Affidavit of Barbara Collins ("Collins Aff."), ¶ 13; Affidavit of Gabby Miles ("Miles Aff."), ¶ 8; Deposition of Kendall Van Scoyk ("Van Scoyk Dep.") at 34; Deposition of Eric Vermeulen ("Vermeulen Dep.") at 13).

13. After this case was filed, Indiana passed a law which prohibits the division of family and children from initiating proceedings to transfer legal custody of mentally ill children who are voluntarily placed outside the home for the purpose of obtaining special treatment or care, solely because the parent is unable to provide the treatment or care. Ind.Code 31–34–1–16(a) (effective July 1, 2001).

14. Because of the newness of this state law, it is unclear whether or how the county offices of family and children are implementing this law. (Vermeulen Dep. at 18, 21–23).

15. However, at least one such county office, Lake County Office of Family and Children, still files CHINS petitions on such a basis. (Van Scoyk Dep. at 34).

16. Once a ward of the county, a child can get coverage for medically necessary residential treatment through payment from the county division of family and children. (Gable Dep. at 15–16, 21; Vermeulen Dep. at 8, 13; Van Scoyk Dep. at 31–32).

17. Brandon Collins ("Brandon"), born March 28, 1995, has Bipolar Disorder, Oppositional Defiant Disorder, Organic Personality Syndrome, and Attention Deficit Hyperactivity Disorder (ADHD), and was born addicted to Vicoden, a pain medication. (Collins Aff., ¶ 3).

18. Brandon has been a Medicaid recipient since his birth. (Collins Aff., ¶ 4; Van Scoyk Dep. at 5).

---

**2.** The two cited by Plaintiffs are Deaconess Cross Pointe in Evansville, Indiana and Wabash Valley Hospital in West Lafayette, Indiana. (*See* Rietman Aff. and Affidavit of Craig Lysinger ("Lysinger Aff.")). Wabash Valley Hospital closed in June 2001. (Lysinger Aff., ¶ 2).

19. On October 31, 2000, Barbara Collins ("Collins"), Brandon's maternal grandmother, became the adoptive mother of Brandon, and he lived with Collins in Lake County, Indiana. (Collins Aff., ¶¶ 5, 6).

20. From February 2000 to July 2000, Brandon had to be hospitalized four (4) times due to violent behavior. (Collins Aff., ¶ 9; Deposition of Barbara Collins ("Collins Dep.") at 15).

21. During one hospitalization at Behavioral Healthcare in Plymouth, Indiana, Collins was informed that day treatment would be the most appropriate placement for Brandon, but that no such treatment program was available in Lake or Porter Counties in Indiana; therefore, Brandon was placed into acute care at Behavioral Healthcare in Plymouth. (Collins Aff., ¶ 10).

22. Collins was subsequently informed by Behavioral Healthcare that Medicaid would no longer provide reimbursement for acute care services for Brandon, and therefore, Collins had to take Brandon to her home. (Collins Aff., ¶ 11).

23. Behavioral Healthcare recommended to Collins that she contact the Child Protective Services ("CPS") division of the Indiana Family and Social Services Administration for assistance in finding placement for Brandon. (Collins Aff., ¶ 12).

24. When she contacted CPS, CPS required Collins to complete documents indicating that Brandon should be made a CHINS and, subsequently, a ward of the local office of family and children, in order for Brandon to obtain Medicaid coverage for the necessary mental health services. (Collins Aff., ¶ 13; Van Scoyk Dep. Ex. A).

25. Behavioral Healthcare also wrote to the Lake County Office of Family and Children so that Brandon could obtain payment for necessary mental health treatment. (Van Scoyk Dep. at 10–11; Van Scoyk Dep. Ex. B).

26. In approximately mid-July 2000, the Lake County juvenile court found that Brandon was a CHINS and a ward of the state due to Collins' inability to care for him given his mental health disabilities. (Collins Aff., ¶ 14).

27. Once Brandon became a ward of the State, Brandon was sent to the ARK, a residential treatment program in the State of Wisconsin. (Van Scoyk Dep. at 29–30; Collins Aff., ¶ 16; Van Scoyk Dep. at 28–29).

28. While he was a ward, Brandon's mental health services were paid for by Medicaid; however, his placement in the ARK was paid for by Lake County funds, not Medicaid. (Amended Complaint, ¶ 49; Answer, ¶ 49; Van Scoyk Dep. at 29).

29. In December 2000, Brandon was released from the residential treatment program in Wisconsin and was sent back to the home of Collins on a trial period. (Collins Aff., ¶ 17; Van Scoyk Dep. at 23).

30. While at home, Brandon received only placement diversion services from South Lake Mental Health, which services were designed to assist in the placement transition. (Collins Aff., ¶ 18; Van Scoyk Dep. at 23).

31. However, at home Brandon suffered from severe violent behavioral problems, such as physical abuse of the household dog and threats to bring guns to his kindergarten class. (Collins Aff., ¶ 19; Van Scoyk Dep. at 27).

32. Brandon was temporarily placed in St. Margaret Mary Health Care, a psychiatric hospital in Dyer, Indiana. (Collins Aff., ¶ 20; Van Scoyk Dep. at 27–28).

33. In February 2001, Brandon was placed back in the home of Collins, where he remains today. (Collins Aff., ¶ 21; Van Scoyk Dep. at 28).

34. In August 2001, the CHINS action as to Brandon was dismissed because there was no further need for court intervention. (Van Scoyk Dep. at 30–31).

35. Brandon's prognosis is that residential treatment may be necessary for him off and on for the rest of his life. (Collins Aff., ¶ 23; Van Scoyk Dep. Ex. B at 2; Van Scoyk Dep. Ex. G, Sec. D; Van Scoyk Dep. Ex. H at 1, Sec. D; Van Scoyk Dep. Ex. K at 3; Van Scoyk Dep. at 27; Collins Dep. at 21–22).

36. Omega McCullagh ("Omega"), born May 10, 1986, suffers from Bipolar Disorder, Oppositional Defiant Disorder, Depression, and frequent suicidal ideation. Omega has been a Medicaid recipient since 1999. (Miles Aff., ¶ 3); Deposition of Patricia Parker ("Parker Dep.") at 7).

37. After many unsuccessful attempts at treatment for Omega, such as counseling and placement at home with his mother, Gabby Miles ("Miles"), Omega's psychiatrist eventually found that long term residential treatment would be the best and most appropriate treatment for Omega. (Miles Aff., ¶ 6; Parker Dep. Ex. A).

38. Miles requested information from the State about the in-state residential treatment centers, and was informed that she would not be able to obtain Medicaid-reimbursed residential treatment for Omega in Indiana unless he was made a ward of the State through a CHINS proceeding or a delinquency proceeding. (Miles Aff., ¶ 8).

39. Miles was also provided with the names and telephone numbers of approximately ten (10) residential treatment facilities in the State of Indiana, but all of these facilities told Miles that they could not take Omega because Miles could not pay for the placement and Medicaid would not pay for such placement. (Miles Aff., ¶ 9).

40. On August 2, 2000, Omega's doctor submitted a prior authorization ("PA") request to the state, requesting Medicaid reimbursement for placement at an out-of-state residential treatment facility. (Miles Aff., ¶ 10; Parker Dep. at 8; Parker Dep. Ex. A).

41. On September 7, 2000, the PA request was denied on grounds that it was a non-covered service. (Miles Aff., ¶ 11; Parker Dep. at 10).

42. Miles unsuccessfully appealed that denial through the administrative appeal process. (Miles Aff., ¶ 12; Parker Dep. at 22; Parker Dep. Ex. G).

43. Omega's office of family and children caseworker, Patricia Parker, subsequently informed Miles that she could contact a child protective worker to discuss getting Omega the services he needed that were

not covered by Medicaid. (Parker Dep. at 33–34).

44. Omega is currently residing at home with Miles and is receiving no treatment for his conditions. (Miles Aff., ¶ 13).

45. Omega is suffering severe emotional and mental harm and his behavioral problems are getting worse, making it likely that he is still in need of residential placement. For example, he has attempted to run away from home and has punched walls and doors at home. (Miles Aff., ¶ 14).

46. The certified class in this cause is defined as:

All present and future Medicaid-eligible children under age 21 who require mental health services for which Federal Financial Participation is available, and those children's parents.

## IV. Standard of Review

■ The court reviews a state agency's interpretation of a federal statute *de novo*. *See Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495 (9th Cir.1997); *see also Amisub (PSL), Inc. v. State of Colo. DSS*, 879 F.2d 789, 795 (10th Cir.1989) ("The state agency's determination of procedural and substantive compliance with federal law is not entitled to the deference afforded a federal agency."); *U.S. West Communications v. Hix*, 986 F.Supp. 13, 16 (D.Col.1997) (same). The district court must determine whether the state law and regulations implementing Medicaid are "consistent with federal law." *Orthopaedic Hosp.*, 103 F.3d at 1496.

## V. Discussion

### A. Westside Mothers v. Haveman

■ In *Westside Mothers v. Haveman*, the District Court for the Eastern District of Michigan held that the plaintiffs, in a case similar to this case, could not sue state officials under *Ex Parte Young* to enforce Medicaid EPSDT requirements, and further held that plaintiffs had no private cause of action under Section 1983 for alleged violations of the Medicaid program. *Westside Mothers v. Haveman*, 133 F.Supp.2d 549 (E.D.Mich.2001). In reliance on *Westside Mothers*, Defendants ask the court to bar Plaintiffs' claims in this case as well.

The *Westside Mothers* case has generated controversy among other district courts. In fact, a Michigan district court specifically declined to follow the *Westside Mothers* holding, as have two district courts from the Northern District of Illinois. *See Markva v. Haveman*, 168 F.Supp.2d 695 (E.D.Mich.2001); *Boudreau v. Ryan*, 2001 WL 840583 (N.D.Ill. May 2, 2001); *Memisovski v. Patla*, 2001 WL 1249615 (N.D.Ill. October 17, 2001). Moreover, since the filing of the parties' briefs, the Sixth Circuit issued its opinion in the *Westside Mothers* case and reversed the district court with regard to the issues advanced by the Defendants. *See Westside Mothers v. Haveman*, 289 F.3d 852 (6th Cir.2002). Following the lead of the Sixth Circuit, the court declines to follow the *Westside Mothers* holding. Accordingly, the court finds this action is not barred.

### B. Residential psychiatric treatment

■ Plaintiffs allege the State is violating federal Medicaid law by failing to provide for long-term residential psychiatric treatment to children under the age of 21 whose EPSDT screening reveals that such placement is medically necessary. Plaintiffs bring their claim under Section 1983.

■ Section 1983 provides a federal cause of action against anyone who, acting pursuant to state authority, violates any "rights, privileges or immunities secured by the Constitution and the laws" of the United States. 42 U.S.C. § 1983. Section

1983 provides a remedy for violations of federal statutory and constitutional law. *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

In this case, Plaintiffs assert they have a federal statutory right under the federal Medicaid Act to residential psychiatric treatment. "To determine whether the statute in question gives rise to a federal right, the court must consider three factors: (1) whether the provision in question was 'intend[ed] to benefit' the putative class; (2) whether the interest the Plaintiffs assert is not so 'vague and amorphous' that it is beyond the competence of the judiciary to enforce; and (3) whether the provision in question creates a binding obligation on the governmental unit." *Pediatric Specialty Care v. Arkansas Dep't of Human Services,* 293 F.3d 472, 477–78 (8th Cir.2002) (citing *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)); *see also Westside Mothers,* 289 F.3d at 862–63.

The parties did not discuss this three-part test. Based upon the parties' briefs and asserted facts, the court can only surmise (1) that the Plaintiffs bringing this suit are the intended beneficiaries of the EPSDT provisions; (2) that federal Medicaid law is not so "vague and amorphous" that it is beyond the competence of the judiciary to enforce; and (3) that the EPSDT provision in question creates a binding obligation on the governmental unit, *i.e.,* the State.

### 1. The EPSDT Program

The Medicaid program provides a federal subsidy to states that choose to reimburse poor individuals for certain medical care. *See* 42 U.S.C. § 1396 *et seq.* Although participation in the program is voluntary, states which choose to participate in the Medicaid program must comply with federal Medicaid law. 42 U.S.C. § 1396a(a); *Schweiker v. Gray Panthers,* 453 U.S. 34, 36–37, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981). Like all other states, Indiana participates in the federal Medicaid program and is bound by its requirements. Ind.Code 12–15–1–1 *et seq.*

Federal Medicaid law requires participating states to provide for an EPSDT program for Medicaid-eligible children under the age of 21. 42 U.S.C. § 1396d(a)(4)(B). The scope of EPSDT services is defined at 42 U.S.C. § 1396d(r)(5). According to the definition, EPSDT services are mandated if those services are a type of "medical assistance," as defined in section 1396d(a), that is "necessary ... to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5). Thus, Indiana[3] must provide children under 21 with Medicaid coverage for all corrective treatment that is found to be necessary in an EPSDT screening and that is a covered service under federal Medicaid law, even if such service is not normally covered under the State's Medicaid program.

All Plaintiffs are Medicaid recipients under the age of 21 and are entitled to EPSDT services. Therefore, if residential services qualify as EPSDT services, then the State must provide them under its Medicaid plan. A threshold question, however, is whether these services are "medi-

---

**3.** In keeping with this federal mandate, Indiana's EPSDT program, entitled Health Watch, provides that services not covered by the State Medicaid plan are still available to EPSDT-eligible Medicaid recipients, subject to prior approval, if the service "is necessary to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services." 405 IAC 5–15–4.

cal assistance" necessary to "correct or ameliorate" the Plaintiffs' mental illnesses.

## 2. "Residential Psychiatric Facility"

As a Medicaid participant, Indiana must provide "for making medical assistance available" to eligible recipients. 42 U.S.C. § 1396d. The term "medical assistance" includes inpatient psychiatric hospital services or other inpatient psychiatric services in another setting specified by the Secretary of Health and Human Services for children under the age of 21. 42 U.S.C. § 1396d(a)(16); 42 U.S.C. § 1396d(h).[4] The federal regulations define "inpatient psychiatric services for individuals under age 21" as "[a] psychiatric facility that is not a hospital and is accredited by the Joint Commission on Accreditation of Healthcare Organizations ..." See 42 C.F.R. § 440.160; 42 C.F.R. § 441 .151. In addition, the federal regulations provide that "inpatient psychiatric services" must involve active treatment. "Active treatment" is defined as implementation of an individual plan of care which is designed to improve the patient's condition as soon as possible to the point that inpatient care is no longer necessary, and which is developed and supervised by an interdisciplinary team of physicians and other personnel employed by the facility. 42 C.F.R. § 441.154; 42 C.F.R. § 441.156.

Thus, a residential treatment facility accredited by the Joint Commission on Accreditation of Healthcare Organizations that provides active treatment to children under age 21 according to the dictates of a treatment team and under the direction of a physician qualifies as a residential psychiatric treatment facility whose services may be paid for by Medicaid funds. Indiana has such a treatment facility. Deaconess Cross Pointe in Evansville, Indiana has a residential treatment program that meets the residential psychiatric treatment facility qualifications of federal law. (See Reitman Aff.). However, the State does not provide Medicaid coverage for children's medically necessary placement in such psychiatric treatment facilities. In fact, the State does even recognize the category of "residential psychiatric facility."

According to the State, the psychiatric services to which an EPSDT child is entitled involve only "active" treatment. Although the term "active" treatment requires a plan of care "designed to achieve the recipient's discharge from inpatient status at the earliest possible time," 42 C.F.R. § 441.154, isn't that always the goal of treatment? The State also cites the "correct or ameliorate" language of the EPSDT statute, and argues in a cursory fashion, "This [the "correct or ameliorate" language] does not anticipate the type of long-term residential care that Plaintiffs want." (See Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Motion for Summary Judgment at 15). The

---

4. The term "inpatient psychiatric hospital services for individuals under age 21" includes only—

(A) inpatient services which are provided in an institution.. which is a psychiatric hospital as defined in ... [42 USC § 1395x(f) ] or in another inpatient setting that the Secretary has specified in the regulations;

(B) inpatient services, which, in the case of any individual (i) involve active treatment which meets such standards as may be prescribed in regulations by the Secretary, and

(ii) a team, consisting of physicians and other personnel qualified to make determinations with respect to mental health conditions and the treatment thereof, has determined are necessary on an inpatient basis and *can reasonably be expected to improve the condition, by reason of which such services are necessary, to the extent that eventually such services will no longer be necessary* ...

42 U.S.C. § 1396d(h)(A) & (B) (emphasis added).

Medicaid Act specifically directs the State to "ameliorate" mental illnesses in children. "Ameliorate" is defined as "to make better or more tolerable." WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1963). There is no time limitation evident in this definition. Required treatment includes anything which is to make a condition, even a long-term condition like mental illness, more tolerable.

On a more practical level, one cannot overlook the fact that the parents of these children cannot afford the room and board costs associated with residential treatment. So to say that the State complies with the EPSDT statute by failing to provide for medically necessary long-term residential treatment is essentially to deny the care required to treat these severely-troubled children. As noted by Plaintiffs' counsel at oral argument, the State has decided that these children are "lost causes" and that it is not feasible to treat these children. In other words, they are "too disabled" for treatment. The court does not believe that this was the intent of Congress in enacting the federal Medicaid Act.

In sum, the court finds that the State's standing policy of refusing to provide long-term residential treatment for those patients for whom such treatment has been found necessary by EPSDT screenings violates the federal Medical Act. The court therefore **GRANTS** Plaintiff's Motion for Summary Judgment with respect to Plaintiff's request for declaratory relief. In addition, the court **GRANTS** Plaintiff's Motion for Summary Judgment with respect to Plaintiff's request for preliminary injunctive relief. Defendants are hereby enjoined to provide Medicaid-eligible children under the age of 21 with the mental health treatment found to be necessary by EPSDT screenings. Given that stated above, the court **DENIES** Defendants' Motion for Summary Judgment.

## C. Family Association

■  Plaintiffs also allege that the State violates their constitutional right to family association under the Fourteenth Amendment of the United States Constitution by requiring that children be made wards of the State via a CHINS action in order to obtain payment for necessary residential placement for mentally ill children.

Prior to a recent change in the law, the only way the parent of a child in need of residential psychiatric treatment could obtain the funds necessary to cover the costs of room and board was to have a local office of family and children file a CHINS action and have the child declared a CHINS. However, effective July 1, 2001, Indiana law was changed to provide an alternative method for obtaining needed services for children. Under this new law, parents who are unable to provide for treatment outside the home for a mentally ill child no longer need to have their child declared a CHINS in order to receive public funds. Ind.Code § 31–34–1–16(a). Nevertheless, the evidence is undisputed that Lake County[5] is still filing CHINS petitions solely to get the child out of the home and into a residential placement paid by county funds. Therefore, the issue presented by Plaintiffs is ripe for review.

■  When addressing alleged substantive due process violations, a court must engage in a three-part test. First, the court must "examine the nature of the interest at stake to discern whether it is a fundamental right within the Fourteenth Amendment's protection of liberty and

---

**5.** The Lake County Office of Family and Children is deemed to be a part of the State Family and Social Services Administration. *J.A.W. v. State,* 687 N.E.2d 1202 (Ind.1997)

(County departments of public welfare (now offices of family and children) are arms of the State of Indiana and are therefore not "persons" amenable to suit under Section 1983).

property." *Joyner v. Dumpson,* 712 F.2d 770, 777 (2d Cir.1983) (internal citations omitted). After resolving this inquiry, the court must determine whether "the state's action has significantly infringed that fundamental right" and, if so, whether the state's interest justifies that infringement. *Id.*

The United States Supreme Court and other Circuit Courts of Appeal have held that the right to family association is a fundamental right within the Fourteenth Amendment's protection of liberty and property. *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (there is "a fundamental liberty interest of natural parents in the care, custody, and management of their child."); *Brokaw v. Mercer County,* 235 F.3d 1000, 1018 (7th Cir.2000) ("The Supreme Court has long recognized as a component of substantive due process the right to familial relations."). *See generally Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Therefore, the court's first inquiry must be resolved in favor of the Plaintiffs.

The court's next inquiry is whether this right is significantly infringed by the State's policy of requiring Medicaid-eligible children in need of residential treatment to become a CHINS in order to obtain funds for room and board in such facility. The State contends that it is not. In support of its argument, the State cites the court to the Second Circuit's decision in *Joyner, supra.*

In *Joyner,* the Second Circuit Court of Appeals reviewed provisions of New York law which required a transfer of custody in order for residential mental health services to be funded. As in this case, the plaintiffs in *Joyner* asserted that this transfer of custody requirement violated their right to family association. The district court concluded that a transfer of custody was a significant infringement on the family's fundamental right to family association. The Second Circuit disagreed:

> We disagree with the district court's conclusion for three reasons. First, the district court incorrectly assumed that a transfer of "custody" would deprive parents of all rights to "rear" their children. Our scrutiny of the New York case law demonstrates that a transfer of "custody" pursuant to New York's foster care statutes does not result in parents' wholesale relinquishment of their right to rear their children. Second, the district court made no reference to the New York social services regulations which govern the temporary foster care system. Yet, it appears that the whole orientation of that system is to try to keep the natural family together. Third, although the remedy sought by the plaintiff class is a declaration that they have the right to tailor state-subsidized programs to suit their own needs, we do not believe that the state is obligated to contour voluntary social service programs such as residential foster care to accord with the desires of each of the participants.

*Joyner,* 712 F.2d at 778.

The Second Circuit's reasoning and analysis of New York law and federal constitutional law is equally applicable to the facts and law in this case. Indiana's statutory scheme for a child in need of services is found at Indiana Code § 31-34-1-1 *et seq.* Indiana Code § 31-34-20-1 offers the court seven dispositional alternatives, only one of which is wardship. *See* Ind. Code § 31-34-20-1(4). Notably, none of the options identified in Indiana Code § 31-34-20-1 require the termination of parental rights. Thus, this type of voluntary "transfer" of custody does not deprive

the Plaintiffs of the rights to "rear" their children.

In addition, Indiana Code § 31–34–19–6 provides the factors to be considered in a court's dispositional decree:

> Sec. 6. If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
> (A) in the least restrictive (most family like) and most appropriate setting available; and
>
> (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
>
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

These factors illustrate that the Indiana CHINS law is consistent with a parents' right to rear his or her child.

For these reasons, the court concludes that requiring a child to be declared a CHINS in order to receive funding for room and board for residential treatment is not a significant infringement of the Plaintiffs' right to family association. Accordingly, the court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's Fourteenth Amendment family association claim.

## VI. Conclusion

For the reasons set forth above, the court **GRANTS** in part, and **DENIES** in part, Plaintiffs' Motion for Summary Judgment and **GRANTS** in part, and **DENIES** in part, Defendants' Motion for Summary Judgment. Specifically, the court **GRANTS** Plaintiffs' request for declaratory relief and **GRANTS** Plaintiffs' request for preliminary injunctive relief. Defendants are hereby enjoined to provide Medicaid-eligible children under the age of 21 with the mental health treatment found to be necessary by EPSDT screenings. In addition, the court **GRANTS** the Defendant's Motion for Summary Judgment on Plaintiffs' Fourteenth Amendment family association claim, and **DENIES** Plaintiff's Motion for Summary Judgment with respect to the same.